

FILED

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (CSB# 219683)
333 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
lrosen@rosenlegal.com

2011 APR 18  PM 4: 18

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

Attorneys for Lead Plaintiff and the Class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

--------------------------------------------------X

STREAM SICAV, AND TODD MARX,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs,

        vs.

RINO INTERNATIONAL
CORPORATION, DEJUN ZOU,
JIANPING QIU, YI JENNY LIU, BEN
WANG, KENNITH C. JOHNSON, XIE
QUAN, WEIGUO ZHANG AND LI YU

        Defendants.

--------------------------------------------------X

CASE No.: CV 10-8695-VBF
(VBKx)

CONSOLIDATED
AMENDED COMPLAINT

CLASS ACTION

**JURY TRIAL DEMANDED**

1.    Court appointed Lead Plaintiff Stream SICAV and named plaintiff Todd Marx (the "Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Consolidated Amended Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by

1

their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by RINO International Corporation ("RINO" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet;  (e) interviews of several witnesses with personal knowledge of the relevant facts; (f) investigation of Chinese State Administration of Industry and Commerce ("SAIC") filings; (g) investigation and analysis of companies alleged to be customers of the Company; and (h) investigation and analysis of companies alleged to be suppliers of the Company.

2.     Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

# I.  NATURE OF THE ACTION

3.     This is a federal securities class action on behalf of a class consisting of all persons and entities, other than defendants and their affiliates, who purchased the publicly traded common stock and call options and who sold put options of RINO between March 31, 2009 through November 17, 2010 (the "Class Period"),

seeking to recover damages caused by defendants' violations of federal securities laws (the "Class.").

4.     RINO is a holding company. It primarily operates through its subsidiaries and variable interest entities ("VIEs") in the People's Republic of China ("PRC").  It purports to engage in the design, development, manufacture and installation of industrial equipment used mainly for environmental protection in the PRC.

5.     During the Class Period, Defendants engaged in a wide-ranging fraud including:

- Overstating revenue and income by at least 94% for fiscal 2009 and 85% for fiscal 2008.

- Reporting $192.6 million of revenue in 2009 and $139.3 million in 2008, when the true revenue figures were not more than $11.1 million in 2009 and $19.6 million in 2008.

- Overstating gross profit in fiscal 2009 by over $71 million or 99%.

- Fabricating contracts with customers.

- Understating PRC tax liabilities by $14.0 million for fiscal 2009.

- Failing to disclose material related party transactions including that RINO paid approximately $73.8 million in 2009 and $49.3 million in 2008 for raw materials to two supplier companies, one owned by the

CEO's mother, and the other owned by the CEO's nephew (also a RINO employee).   RINO violated generally accepted accounting principles ("GAAP") which require disclosure of related party transactions.

6.     On November 10, 2010, news of the fraud was disclosed in a report by analyst firm Muddy Waters LLC ("Muddy Waters"), causing RINO's stock to immediately drop $4.42/share or 28%.

7.     Within days, other analysts recommended selling RINO shares based on the fraud, the company postponed its quarterly conference call, and as a result RINO's share price dropped another $5.03/share until NASDAQ suspended all trading in RINO shares on November 19, 2010.

8.     That same day, RINO's CEO Dejun Zou admitted the truth of certain of Muddy Waters allegations, including that two of the four contracts mentioned in the Report were fraudulent and that there were "problems with 20%-40%" of RINO's other contracts.

9.     In its November 19, 2010 announcement, RINO warned that its financial statements for 2008 and 2009 were unreliable (i.e. false), should not be relied on by investors and must be restated.

10.     RINO also announced that it would conduct an internal investigation of the fraud.

11.     On December 2, 2010, RINO announced that Nasdaq was terminating trading of RINO shares and that the SEC was conducting an investigation of the Company.

12.     On April 11, 2011, the SEC issued a formal order suspending trading in RINO securities because "It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of RINO International Corporation, because the company has failed to disclose that

(i)     the outside law firm and forensic accountants hired by the audit committee to investigate allegations of financial fraud at the company resigned on or about March 31, 2011, after reporting the results of their investigation to management and the board;

(ii)    the chairman of its audit committee resigned on March 31, 2011; and

(iii)   the company's remaining independent directors have also resigned.

Further, questions have arisen regarding, among other things:

(i)     the size of the company's operations and number of employees;

(ii)    the existence of certain material customer contracts; and

(iii)   **the existence of two separate and materially different sets of corporate books and accounts."**

[emphasis added] (The SEC order is attached as Exhibit A and incorporated herein).

13.     RINO is a complete fraud. Most of its revenue and operations existed only in its false SEC filings, fraudulent financial statements, and phony press releases.

## II. JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

17.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

18.     Court appointed lead plaintiff Stream SICAV purchased RINO common stock during the Class Period and have suffered damages as a result.  Its PSLRA Certifications has previously been filed with the Court and are incorporated herein by reference.

19.     Named Plaintiff Todd Marx bought January 21, 2012 call options on RINO common stock during the class period and has suffered damages as a result. His PSLRA Certification is attached as Exhibit B and incorporated herein by reference.

20.     Defendant RINO purports to engage in design, development, manufacture and installation of industrial equipment used mainly for environmental protection purposes in the PRC.

21.     To have its stock publicly traded in the United States, RINO employed a device called a "reverse merger" in 2007. In a reverse merger, a publicly traded shell company acquires the private company seeking to go public.  In exchange, the shareholders of the former private company receive a controlling share of the public company.

22.     As a result of the reverse merger, RINO became a holding company that primarily operates through Innomind Group Limited ("Innomind Group"), its wholly-owned subsidiary. Innomind Group was formed on November 17, 2006, under the laws of the British Virgin Islands, and is an investment holding company.

23.     Innomind Group operates through Dalian Innomind Environment Engineering Co., Ltd. ("Dalian Innomind"), its wholly-owned subsidiary. Dalian Innomind was incorporated on July 9, 2007 in the PRC, as a wholly-owned foreign limited liability company.

24.     Dalian Innomind, signed Restructuring Agreements with Dalian Rino Environment Engineering Science and Technology Co., Ltd. ("Dalian Rino"), a company owned by RINO's CEO Zou and its Chairman Qiu.

25.     All of RINO's business and operations is conducted through Dalian Rino.

26.     Pursuant to the Restructuring Agreements, Dalian Innomind has only contractual rights over, but not ownership of, Dalian Rino's operations and income.

27.     The Restructuring Agreements call for Dalian Rino's annual net profits to be paid to Dalian Innomind as a management fee.  Apart from the management fee payable to RINO from Dalian Rino, RINO has no other significant source of income.

28.     Thus RINO by contract "controls" Dalian Rino and it only benefits from the payment of Dalian Rino's net profits to Dalian Innomind as a management fee.

29.     Defendant Dejun Zou ("Zou") was RINO's CEO and board member at all relevant times. In addition, Defendant Zou was a substantial shareholder of the Company throughout the Class Period.  When the Company filed its 2008 10-K and 2009 10-K, Defendant Zou owned 64.33% and 58.32% of the Company's stock, respectively.

30.     Defendant Jianping Qiu ("Qiu") was RINO's Chairman of the Board of Directors from March 2008 through the present, and was the acting CFO from

September 5, 2008 to June 30, 2009. In addition, Defendant Qiu was a substantial shareholder of the Company throughout the Class Period.  When the Company filed its 2008 10-K and 2009 10-K, Defendant Qiu owned 7.15% and 6.26% of the Company's stock, respectively. Qiu and Zou are married to each other.

31.     Defendant Yi "Jenny" Liu ("Liu") was RINO's CFO from June 30, 2009 until her resignation on April 26, 2010.

32.     Defendant Ben Wang ("Wang") was RINO's CFO from April 26, 2010 through the present.

33.     Defendant Kennith C. Johnson ("Johnson") was a director of RINO from March 2008 through the present. At all times during the Class Period, Johnson was the chair of RINO's audit committee, as well as a member of RINO's compensation committee and nominating committee.  Johnson is a CPA and former auditor employed by Arthur Andersen.

34.     Defendant Quan Xie ("Xie") was a director of RINO from March 2008 through the present.  At all times during the Class Period, Xie was a member of RINO's audit committee and nominating committee, as well as the chair of RINO's compensation committee.

35.     Defendant Weiguo Zhang ("Zhang") was a director of RINO from March 2008 through the present.  At all times during the Class Period, Zhang was a member of RINO's audit committee and compensation committee, as well as the chair of RINO's nominating committee.

36.     Defendant Li Yu ("Yu") was RINO's Controller, i.e. principal accounting officer, from November 2009 through the present.

37.     Zou, Qiu, Liu, Wang, Xie, Zhang, Johnson and Yu are collectively referred to hereinafter as the "Individual Defendants."

## A. <u>The Audit Committee</u>

38.     According to the Company's 2009 10-K, the audit committee "assists the Board in fulfilling its oversight responsibilities relating to:

- our auditing, accounting and reporting practices;
- the adequacy of our systems of internal controls;
- the quality and integrity of publicly reported financial disclosures.

In this role, the committee appoints the independent auditors and reviews and approves the scope of the audit, the financial statements and the independent auditors' fees."

39.     According to RINO's 2009 10-K, the audit committee was comprised of Defendant Johnson, Xie and Zhang, with Johnson serving as chairman.

40.     Defendant Johnson, Xie and Zhang as members of the audit committee had an affirmative duty of oversight and responsibility for the integrity of RINO's financial reporting.

## B. <u>Respondeat Superior Liability</u>

41.     RINO is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

42.     The *scienter* of the Individual Defendants and other employees and agents of the Company is similarly imputed to RINO under *respondeat* superior and agency principles.

## IV.     DEFENDANTS' MATERIAL OMMISSION AND MISREPRESENTATIONS

### A. RINO's 2008 10-K is False and Materially Misstated

43.     The Class period begins on March 31, 2009, when the Company issued its fiscal 2008 annual report on form 10-K containing false and misleading financial statements for fiscal years 2007 and 2008.

44.     The false and misleading 2008 10-K was signed by defendants Zou, Qiu, Zhang, Quan and Johnson. Defendants Zou and Qiu signed the accompanying Sarbanes-Oxley ("SOX") certifications, certifying accuracy of RINO's financial statements.

45.     The 2008 10-K was false because it materially misstated RINO's revenue, expenditures, tax liabilities and net income.

a.     The revenue reported by RINO with the PRC State Administration for Industry and Commerce ("SAIC")[1] for fiscal 2008 is

1 The SAIC (State Administration for Industry and Commerce)  is the Chinese government body that regulates industry and commerce in China.  It is primarily responsible for business registration, business licenses issuing and renewing, and acts as the government supervisor of corporations. All Chinese companies are

substantially less than the revenue RINO reported in its audited financial statement filed with the SEC.

| (In USD million) | SEC 2008 | SAIC 2008 | Amount of Overstatement | SAIC Amount as % of SEC Amount |
|---|---|---|---|---|
| Revenue | $139.30 | $19.61 | $119.69 | 14.08% |

b.      Plaintiffs' counsel's investigators contacted the companies RINO claimed in its annual report were its customers to determine whether in fact they were RINO customers. The investigators also did research of relevant PRC governmental and online databases.  Of RINO's ten customers listed in its 2008 10-K, four have affirmatively stated to Plaintiffs' investigator that they never purchased any goods or services from RINO. Four customers stated they did purchase goods or services from RINO and two customers Plaintiffs' investigator was unable to contact.  (See detailed discussion on the purported customer list below and Exhibit D).

c.      Additional evidence that Rino's financial statements generally, and revenue in particular, are inaccurate is that the amount RINO claims to have paid in Value-Added-Taxes ("VAT") to PRC authorities in the 2008 10-K implies a level of revenue that is materially different than RINO reported.

---

required to file financial statements with the Chinese government annually or bi-annually.

Class Action Complaint for Violation of the Federal Securities Laws

RINO disclosed that VAT on sales amounted to $37.1 million in 2008. It also disclosed the VAT standard rate is 17% of the gross sales price. A simple calculation shows revenue would be $218.2 million ($37.1 \div 17\% = 218.2$) based on the declared VAT paid, significantly greater than the reported $139.3 million revenue.

d.     RINO also understated its income tax liability for fiscal 2008. RINO explained in the 10-K that due to a new Chinese tax law, it qualified as an environmental protection industry company, and thus was entitled to a 100% income tax exemption. This is false. According to research done by Plaintiffs' forensic accountant, RINO was misstating the law because the law only allows tax exemptions for operational revenue earned on qualifying environmental protection projects approved by the state, rather than entity-wide income.  As a result RINO actually accrued, but failed to report on its balance sheet and income statement, an unpaid tax liability for fiscal 2008 of $3,192,259.

e.     By improperly failing to record income tax on the net profit, RINO overstated the Company's net income and earnings per share for the year 2008. Of course, this assumes RINO actually earned the income it claims it did.

46.    The 2008 10-K was also false and misleading because it concealed related party transactions.

47.    RINO's two largest suppliers were secretly owned by CEO Zou's mother and nephew respectively.

48.    Generally Accepted Accounting Principles ("GAAP"), Statement of Financial Accounting Standards ("SFAS") and SEC regulations required the Company to disclose all material related party transactions.

49.    Statement of Financial Accounting Standards ("SFAS") No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; 850-10-50-1 . "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates."  SFAS No. 57 ¶ 1; 850-10-05-3.  "Affiliate" includes any company that is under common control or management with the public company.  SFAS No. 57 ¶ 24(a, b); 850-10-20.

50.    Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; 850-10-50-1.

51.   According to the 2008 10-K, RINO purchased $3.4 million worth of raw materials from Dalian Shuangying Trading Co., Ltd. ("Shuangying Trading") in fiscal 2008, representing 6% of RINO's total purchase of raw materials in 2008.

52.   RINO, however, did not disclose that Shuangying Trading was owned by RINO CEO Zou's nephew, who was also an employee of RINO.

a.   Shuangying Trading's SAIC filings showed that it was registered on September 27, 2007, with Ze Zhang ("Ze") as the sole shareholder and legal representative (Please note that RINO went public in the United States in 2007).

b.   Based on the information discovered by Plaintiffs' investigator, Ze is RINO CEO Zou's nephew. Such relationship was also reported in an article published in Global Entrepreneur, one of the most popular business magazines in China.[2]

c.   Besides being one of two primary suppliers to RINO, Dalian Rino's SAIC filings also showed that Ze was one of Dalian RINO's directors from December 2006 to July 2007. On July 27, 2010, a local government website reported that Zhang was elected as one of the "Excellent Communist

---

[2] http://www.gemag.com.cn/gemag/index/news/indexs.asp?D_ID=14243

Party Members" in Dalian Rino.[3] Another Chinese website showed that Ze and RINO's chairman Qiu co-owned a patent.[4]

   d.   Further evidence to prove Ze and Zou's family relationship can be found in the 2008 10-K. RINO reported that Ze was the sole shareholder of Innomind Group before the share exchange transaction between Innomind Group and RINO in 2007. Simultaneously with the consummation of the share exchange, Ze transferred and conveyed all of his Control Shares to the Innomind Trust, of which Defendant Zou and Qiu are the sole beneficiaries.

   e.   Born in 1981, Ze was only 26 years old in 2007. As reported by the Global Entrepreneur, Ze's role in the series of transactions was controlled and pre-arranged by Defendant Zou, with the purpose of completing the reverse merger. In short, Ze served as a straw man to help defendant Zou complete the reverse merger.

53.   Shuangying Trading is just a shell company. According to a credit report issued by Qingdao Inter-credit, a reputable credit reporting agency in China, Shuangying Trading has no known phone number, no website, no information obtainable online, and no determinable business operations. These facts have also been verified by Plaintiffs' investigator.

---

[3] http://www.dlpty.com/5NewsInfo.asp?id=246
[4] http://xkb.bjmu.edu.cn/query/Patentmsg.asp?sqh=200780010654.0

54.   RINO's other major supplier is Dalian Shuntongda Trading Co., Ltd. ("Shuntongda Trading").

55.   According to the 2008 10-K, RINO purchased $45.9 million of raw materials from Shuntongda Trading in fiscal 2008, representing 82% of RINO's total purchase of raw materials.

56.   RINO, however, did not disclose that Shuntongda Trading was owned by CEO Zou's mother.

57.   Shuntongda Trading's SAIC filings showed that it was registered on January 26, 2007 with Guimei Luan ("Luan") as the sole shareholder and legal representative.

58.   According to Plaintiffs' investigator, Luan is RINO CEO Zou's mother.

59.   In 2007, when Shuntongda Trading was established (it was also the year that RINO went to public in the United States), Luan was a 72 year old lady without any previous business experience. However, according to RINO's financial statements, her brand new business successfully earned revenue of $20.4 million and $45.9 million by selling raw materials to RINO in 2007 and 2008, amounting to 95% and 82% of RINO's total raw materials purchase for each year, respectively.

60.   Shuntongda Trading was dissolved voluntarily by Luan, the sole shareholder, on December 30, 2010, just a month after RINO's fraud was exposed publicly.

61.    According to Shuntongda Trading's SAIC records, its annual revenue was $0 in fiscal 2008. Searches of PRC online databases by Plaintiffs' investigator showed that Shuntongda Trading had no known phone number, no website, no information obtainable online and no determinable operations. It was just a shell company.

62.    Also indicative of fraudulent financial reporting, contrary to general business practice in China, RINO made huge cash advances to both Shuangying Trading and Shuntongda Trading for the future purchase of raw materials. As of December 31, 2008, total cash advances made to the two suppliers amounted to $22.0 million.

**B. RINO's 2009 10-K is False and Materially Misstated**

63.    On March 31, 2010, the Company issued its fiscal 2009 annual report on form 10-K. The 2009 10-K contains false and misleading financial statements for fiscal years 2008 and 2009.[5]

64.    The false and misleading 2009 10-K was signed by defendants Zou, Qiu, Zhang, Quan and Johnson. Defendants Zou, Liu and Li signed the accompanying SOX certifications, certifying the accuracy of RINO's financial statements.

---

5   The 2009 10-k included the same fraudulent financial statements for fiscal 2008, containing the same false and misleading information for fiscal 2008, as described above.

Class Action Complaint for Violation of the Federal Securities Laws

65.     The 2009 10-K was false because it also materially misstated revenue, gross profit, expenses, tax liabilities, and net income for the same reasons that Rino's 2008 financial statements were false and misleading:

a.     The revenue reported by RINO with the PRC SAIC for fiscal 2009 is substantially less than the revenue RINO reported in its audited financial statement filed with the SEC for 2009.

| (In USD million) | SEC 2009 | SAIC 2009 | Amount of Overstatement | SAIC Amount as % of SEC |
|---|---|---|---|---|
| Revenue | $192.60 | $11.10 | $181.50 | 5.76% |

b.     Plaintiffs' counsel's investigators contacted the companies RINO claimed in its annual report were its customers to determine whether in fact they were RINO customers. The investigators also did research of relevant PRC governmental and online databases.  Of RINO's fourteen customers listed in its 2009 10-K, upon questioning by Plaintiffs' investigators, five affirmatively denied ever having purchased any goods or services from RINO in 2009.  Plaintiffs' investigator was unable to find and communicate with the remaining nine customers. (See detailed discussion on the purported customer list below and Exhibit D).

c.     RINO's revenue and gross profit is also shown to be false based on Dalian Rino's Value-Added-Tax ("VAT") payment records filed with the

Chinese Tax Bureau which report that RINO paid only $0.18 million (RMB 1.2 million) VAT for 2009.[6]

d.      RINO reported $72.3 million in gross profit in fiscal 2009. Based on Dalian Rino's actual VAT paid to the Chinese Tax Bureau, RINO's gross profit could not possibly be more than $1.1 million and was likely much less because of additional costs of sales.[7]   Thus, RINO fabricated approximately $71.6 million or 99% of its $72.3 million gross income in fiscal 2009.

e.      The VAT payable in RINO's 2009 10-K implies a level of revenue that is materially different than RINO reported. RINO disclosed that VAT on sales amounted to $53.1 million in 2009. It also disclosed the VAT standard rate is 17% of the gross sales price. A simple calculation shows RINO's revenue should be $312.4 million if its VAT on sales is $53.1 million (53.1÷17%=312.4).   This amount ($312.4 million) is significantly greater than RINO's 2009 reported revenue of $192.6 million.

---

6   A copy of the RINO VAT filing and a translation is attached as Exhibit C.
7   RINO stated that the VAT standard rate is 17% of gross sales price less a credit for VAT it pays on purchases of unfinished goods and raw materials (which is also at the 17% rate).  The maximum gross profit may be calculated as VAT paid divided by 17%.  If one considers that RINO's raw materials amount to approximately 66.4% of costs of sales, gross profit was really closer to $700,000.

f. In addition, the amount RINO reported for VAT payable for fiscal 2009 is 8,000% greater than the actual payment RINO made to the Chinese Tax Bureau for 2009 as shown on its PRC VAT filing.

g. In its 2009 10-K, RINO reported VAT on sales and VAT on purchases amounted to $53,066,225 and $39,728,824 for the year ended December 31, 2009, respectively.

h. Based on RINO's sales and purchases for 2009, RINO should have paid total VAT of $14,260,613 for fiscal 2009.[8]   Yet, RINO actually paid only $180,000 of VAT for 2009.

i. RINO also understated its income tax liability for fiscal 2009.

j. RINO explained in the 2009 10-K that due to a new Chinese tax law, it qualified as an environmental protection industry company, and thus was entitled to a 100% income tax exemption. This is false. According to research done by Plaintiffs' forensic accountant, RINO was misstating the law because the law only allows tax exemptions for operational revenue earned on qualifying environmental protection projects approved by the state, rather than entity-wide income.   Assuming its reported income is not fraudulent, RINO actually accrued, but failed to report on its balance sheet

---

[8]  VAT payable for 2008 was $ 4,186,822 + (VAT on 2009 sales $53,066,225– VAT on 2009 purchases $39,728,824) – VAT payable on current period $3,260,613 = $14,263,610).

and income statement, an unpaid tax liability of $8,458,763 for fiscal 2009 and $3,192,259 for fiscal 2008.

k.     By improperly failing to record income tax on the net profit, RINO overstated the Company's net income and earnings per share for the year 2009.

66.    Of course, since RINO didn't really earn any revenue or income, no taxes were actually payable.   These glaring material inconsistencies in RINO's financial statements simply highlight the magnitude and breadth of Defendants' fraud.

67.    The 2009 10-K was also false and misleading because it concealed related party transactions.

68.    As described above, RINO's two largest suppliers Shuntongda Trading and Shuangying Trading were secretly owned by CEO Zou's mother and nephew respectively.

69.    Generally Accepted Accounting Principles ("GAAP"), Statement of Financial Accounting Standards ("SFAS") and SEC regulations required the Company to disclose all material related party transactions, as more fully described above.

70.    According to RINO's 2009 10-K, its two largest suppliers, Shuangying Trading and Shuntongda Trading, accounted for 93% of RINO's purchases of raw materials in fiscal 2009, with one accounting for 45% and the other 48% of RINO's

raw materials purchases.[9]  RINO's total raw materials purchases in 2009 were approximately $79.4 million.[10]

71.     RINO purchased approximately either $35.7 or $38.1 million worth of raw materials from Shuangying Trading in fiscal 2009, representing 45% or 48% of RINO's total purchase of raw materials in 2009.

72.     RINO, however, did not disclose that Shuangying Trading was owned by RINO CEO Zou's nephew, who was also an employee of RINO.

73.     Shuangying Trading is just a shell company. According to a credit report issued by Qingdao Inter-credit, a reputable credit reporting agency in China, Shuangying Trading has no known phone number, no website, no information obtainable online, and no determinable business operations. These facts have also been verified by Plaintiffs' investigator.

74.     RINO's other major supplier in 2009 is Shuntongda Trading. According to the 2009 10-K, RINO purchased $35.7 or $38.1 million worth of raw materials from Shuntongda Trading  in fiscal 2009, representing 45% or 48% of RINO's total purchase of raw material in 2009.

75.     RINO did not disclose that Shuntongda Trading was owned by CEO Zou's mother.

---

9  RINO doesn't disclose which of the two primary suppliers accounts for 45% and which accounts for 48%.
10   Estimate of 2008 and 2009 total raw materials purchases based on 2007 total raw materials purchases as a percentage of 2007 Costs of Sales, adjusted for amounts remaining in inventory at year end.

76.    Shuntongda Trading was dissolved voluntarily by the sole shareholder on December 30, 2010, just a month after RINO's fraud was exposed publicly.

77.    According to Shuntongda Trading's SAIC records, its annual revenue was $0 in fiscal 2009.  Search of PRC online databases by Plaintiffs' investigator showed that Shuntongda Trading had no known phone number, no website, no information obtainable online and no determinable operations. It was just a shell company.

78.    Also indicative of fraud, contrary to standard business practices in China, RINO made huge advances to both Shuangying Trading and Shuntongda Trading. As of December 31, 2009, total cash advances made to the two suppliers amounted to $34.1 million.

**C. After the Fraud was Disclosed Publicly, RINO's CEO Admitted to Fraudulent Contracts and Inaccurate Financial Statements**

79.    After Muddy Waters issued its report disclosing RINO's fraud, on November 19, 2010, RINO filed an 8-K with the SEC, admitting that:

> "As to the six RINO customer contracts discussed in the recent report of Muddy Waters LLC, the Company did not in fact enter into two of the six purported contracts, and a third contract among the six was explainable." The CEO "was not sure, but there might be problems with 20 - 40%" of the other contracts;

> "The audit report(s) for the periods ended December 31, 2008 and December 31, 2009 and reviewed quarterly financial statements for periods between March 31, 2008 to September 30, 2010 should no longer be relied upon."

### RINO's Fraud was So Serious that the
### SEC Suspended All Trading in RINO Securities

80.     RINO's fraud was so serious, that on November 29, 2010, NASDAQ delisted the Company's securities from trading. RINO accepted such determination and did not appeal.

81.     On December 2, 2010, the Company filed an 8-K with the SEC, disclosing that SEC was conducting an a formal investigation relating to the Company's financial reporting and compliance with the Foreign Corrupt Practices Act for the period January 1, 2008 through the present.

82.     On January 13, 2011, the Company filed with the SEC a Form 15, terminating SEC registration of its securities. Since then, the Company's common stock has been traded in the Pink Sheet market.

83.     On April 11, 2011, the SEC issued a formal order suspending all trading in RINO securities because "It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of RINO International Corporation, because the company has failed to disclose that

(i)     the outside law firm and forensic accountants hired by the audit committee to investigate allegations of financial fraud at the company resigned on or about March 31, 2011, after reporting the results of their investigation to management and the board;

(ii)    the chairman of its audit committee resigned on March 31, 2011; and

(iii)   the company's remaining independent directors have also resigned.

Further, questions have arisen regarding, among other things:

(i)      the size of the company's operations and number of employees;
(ii)     the existence of certain material customer contracts; and
(iii)    the existence of two separate and materially different sets of corporate books and accounts."

84.    The SEC's actions suspending trading and its statements corroborate that RINO"s financial statements are false and misleading and that the Defendants have perpetrated a massive fraud.

## V. ADDITIONAL MISLEADING STATEMENTS

85.    RINO's financial statements contained in its quarterly reports filed with the SEC during the Class Period were also materially false and misleading.

86.    On May 15, 2009, the Company filed its quarterly report for the quarterly period ended March 31, 2009 with the SEC on Form 10-Q ("Q1 2009 10-Q.") The Q1 2009 10-Q was signed by defendants Zou and, pursuant to the SOX, was separately certified by defendants Zou and Qiu attesting to the accuracy of the form. The Q1 2009 10-Q was false and misleading for the same reasons that the 2009 10-K was false and misleading.

87.    On August 10, 2009, the Company filed its quarterly report for the quarterly period ended June 30, 2009 with the SEC on Form 10-Q ("Q2 2009 10-Q.") The Q2 2009 10-Q was signed by defendants Zou and Liu and, pursuant to the SOX, was separately certified by defendants Zou and Liu attesting to the accuracy of the form. The Q2 2009 10-Q was false and misleading for the same reasons that the 2009 10-K was false and misleading.

88.     On November 13, 2009, the Company filed its quarterly report for the quarterly period ended September, 2009 with the SEC on Form 10-Q ("Q3 2009 10-Q.") The Q3 2009 10-Q was signed by defendants Zou and Liu and, pursuant to the SOX, was separately certified by defendants Zou and Liu attesting to the accuracy of the form. The Q3 2009 10-Q was false and misleading for the same reasons that the 2009 10-K was false and misleading.

89.     On December 4 and December 9, 2009, the Company filed a Prospectus with the SEC on form 424B5 ("Prospectus.") The Prospectus incorporated by reference the fraudulent 2008 10-K. It thus contained the same false and misleading statements concerning the fiscal 2008 financial statements as described above.

90.     On August 10, 2010, the Company filed its quarterly report for the quarterly period ended June 30, 2010 with the SEC on the Form 10-Q ("Q2 2010 10-Q.") The Q2 2010 10-Q was signed by defendants Zou and, pursuant to the SOX, was separately certified by defendants Zou and Wang attesting to the accuracy of the form.

91.     The Q2 2010 10-Q was materially false and misleading also because it misstated the revenue and net income. According to an article published on November 10, 2010, by analyst Alfred Little on Seeking the Alpha, a Chinese tax bureau staff member disclosed to him that, for the first six months of 2010, RINO reported sales of only $2.5 million and a net loss of ($914,000). In contrast, the Q2

2010 10-Q reported sales for the same period of $113.2 million and net income of $39 million.

92.    On November 13, 2010, the Company filed its quarterly report for the quarterly period ended September, 2010 with the SEC on the Form 10-Q ("Q3 2010 10-Q.") The 10-Q was signed by defendants Zou and, pursuant to the SOX, was separately certified by defendants Zou and Wang attesting to the accuracy of the form. Similarly, the Q3 2010 10-Q was materially false and misleading for the same reasons that the Q2 2010 10-Q is false and misleading.

## RINO'S LIST OF CUSTOMERS IS FALSE

93.    RINO claimed that "For fiscal years 2008 and 2009, revenues generated from our desulphurization business [FGD] was $105.3 million and $116.4 million, respectively, representing 75.6% and 60.4% of our total revenues for fiscal years 2008 and 2009, respectively."

94.    Both RINO's 2008 10-K and 2009 10-K provided a list of companies that were the customers for RINO's reported desulphurization sales.[11]

95.    In March 2010, the Company issued a presentation to the investors ("March Presentation"). The presentation included customers list and purported sales proportion.

96.    RINO also provided a customer list in its Q1 2010 10-Q.

---

11   Plaintiffs' investigator researched only RINO's customers in the desulphurization business because it accounted for more than 75% and 60% of RINO sales in fiscal 2008 and 2009 respectively

97.   Of the 22 customers listed in RINO's SEC filings and investor presentation, 4 of the claimed customers affirmatively stated to Plaintiffs' investigator that they have been customers of RINO.   2 additional customers affirmatively stated to Muddy Waters' investigator (and which Plaintiffs' counsel confirmed) that they have never been customers of RINO.  PRC newspaper articles and customer websites showed that 4 additional customers were not customers of RINO.  Thus, at least 10 of the 22 claimed customers were not customers of RINO.

98.   Attached as Exhibit D is a chart detailing Plaintiffs' investigation of RINO's customer list.   It appears likely that more than 10 of the 22 claimed customers were not customers of RINO in 2008 or 2009.

## VI.   ADDITIONAL FACTS SUGGESTIVE OF SCIENTER

99.   Defendants CEO Zou and Chairman Qiu have been wrongfully profiting personally from self-dealing transactions with RINO by dint of their control of RINO.

100.   Zou's mother and nephew have received approximately $143.5 million in payments through ownership of two shell companies for purported sales of raw materials to RINO in undisclosed related party transactions in fiscal years 2007-2009.

101.   Zou and Qiu have also failed to pay RINO over $156.5 million in management fees pursuant to the Restructuring Agreements.   Instead of paying these funds to RINO as required, Defendants Zou and Qiu have retained them.

102.   According to PRC SAIC filings, Dalian Innomind's 2009 revenue was $0, meaning that Dalian Rino did not pay the management fee to Dalian Innomind, even though the Restructuring Agreements specified it.   The Q2 2010 10-Q indicates that Dalian Rino still owes $156.5 million to RINO.

103.   In addition, Zou and Qiu breached the Restructuring Agreements by failing to transfer all of Dalian Rino's operating assets to RINO.  RINO's Q2 2010 10-Q filed with the SEC on August 16, 2010 showed that Dalian Rino continued to carry on almost all of RINO's operations.

104.   In short, Zou and Qiu continue to own and control RINO's operating assets even though they promised to transfer them to RINO no later than the end of 2007.

105.   The 2009 10-K disclosed that – in violation of Section 402 of the Sarbanes-Oxley Act – RINO gave Zou and Qiu a $3.5 million interest free, unsecured loan to buy a personal residence in Orange County, CA.

106.   RINO has changed auditors three times in the last 4 years and has changed its CFO's four times in that four year time period.  RINO has also had to complete a restatement of its financial statements for fiscal 2007.[12]

_____

12   Restatements for the fiscal years ended December 31, 2007 and 2006, were necessary because RINO determined that there were material errors in the presentation of current assets, concentration of risks related to the registrant's largest customers and cash flows related to the payment of deposits for the acquisition of property and equipment in the RINO's financial statements.

## VII.   RINO'S STOCK PRICE DROPPED ON SEVERAL TRADING DAYS AS THE FRAUD WAS DISCLOSED PIECEMEAL

### A. The Muddy Waters Report And Its Aftermath

107.   On November 10, 2010, a research company called Muddy Waters LLC ("Muddy Waters") issued a scathing report on RINO (the "Muddy Waters Report" or "Report").

108.   The thirty-page Report rated the Company's stock as a "strong sell" and set forth a host of detailed criticisms that questioned the veracity of the information contained in the Company's financial statements and press releases.

109.   The Report, asserted that the Company's financials were fraudulent.  It alleged revenue was overstated and that many of the company's claimed customers did not exist.

110.   The market was shocked by the revelations.

111.   The news of RINO's fraud disclosed by the Muddy Waters Report caused the Company's stock to decline from its closing price of $15.52/share on November 9, 2010 to close at $13.18/share on November 10, 2010 and drop another $2.08/share to $11.10 on November 11, 2010 —a decline of 28.5%.

112.   Then on November 15, 2010, analyst firm Canaccord Genuity cut its rating on RINO to sell based on the evidence of fraud in the Report.  This caused RINO's stock price drop another $3.46/share (31.4%) to $7.55/share.

113.   On November 16, 2010, RINO announced it was postponing its scheduled third quarter conference call.  As a result of RINO's failure to address the Muddy Waters Report's allegations in the conference call, along with the recent sell recommendation from Canaccord Genuity, RINO's share price dropped another 40 cents.

114.   On November 17, 2010, analyst firm Global Hunter Securities suspended coverage of RINO "due to the lack of company response to fraud allegations."

115.   Also on November 17, 2010, Roth Capital suspended coverage and Rodman and Renshaw placed RINO's rating under review as a result of the allegations of fraud from Muddy Waters.

116.   According to the Wall Street Journal, the analyst downgrades and RINO's failure to address the allegations in the Muddy Water's Report caused RINO's shares to drop from $7.55/share on November 15 to $6.07/share on November 17, 2010.

117.   On November 17, 2010, trading in RINO stock was halted.

118.   On November 19, 2010, the Company issued a statement from the CEO admitting that 2 of the 4 contracts cited by Muddy Waters were fraudulent and that 20-40% of RINO's other contracts "had problems".

119.   The Company stated that investors could no longer rely on RINO's financial statements for fiscal years 2008, 2009 and the quarterly financial reports in 2010 and that such financial statements must be restated.

120.   The Company announced in a December 2, 2010 8-K that the SEC was conducting a formal investigation of RINO relating to its financial statements.

121.   The December 2, 2010 8-K also stated that on November 29, 2010, RINO received a letter from Nasdaq which stated that RINO's shares would be delisted from trading because:

(a)  The Company admitted its financial statements are inaccurate, cannot be relied on and must be restated;

(b)  The Company admitted that it had not entered into certain previously disclosed contracts; and

(c) The Company failed to respond to the Nasdaq's staff request for additional information regarding allegations raised by the Muddy Waters' Report.

122.   As a result of this adverse news, when trading in RINO shares resumed on December 8, 2010, RINO's share price dropped from $6.05/share to $3.15/share –nearly 50%.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VIII.  PLAINTIFFS' CLASS ACTION ALLEGATIONS

123.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of RINO during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the present and former officers and directors of RINO and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

124.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RINO's stock was actively traded on either the OTC market or the NASDAQ.

125.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class. Members of the Class may be identified from records maintained by RINO or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

126.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

127.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

128.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, and financial performance of RINO; and

    c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

129.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    **RELIANCE PRESUMPTION**

130.   At all relevant times, the market for RINO common stock was an efficient market for the following reasons, among others:

a. RINO stock met the requirements for listing, and was listed and actively traded on the OTCBB market (under ticker symbol "JDMC") until July 13, 2009 when it was listed for trading on the NASDAQ market (under ticker symbol "RINO"), both highly efficient and automated markets;

b. As of March 31, 2010, there were 28.6 million shares of the Company's common stock issued and outstanding. The public float (shares not held by insiders/defendants) was about 10.7 million shares;

c. During the class period, on average, 3.8 million shares of RINO common stock were traded on a weekly basis. Approximately 35.5% of the public float, and 13.3% of all outstanding shares, were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

d. As a regulated issuer RINO filed with the SEC periodic public reports and was eligible (and did file) S-3 registration statements with the SEC during the Class Period;

e. RINO regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f. RINO was followed by several securities analysts employed by major brokerage firms including Roth Capital Partners, Rodman and Renshaw and Canaccord Genuity (among others), who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period;

g. At least 75 NASD member firms were active market-makers in RINO stock at all times during the Class Period; and

h. Unexpected material news about RINO was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

Class Action Complaint for Violation of the Federal Securities Laws

# X. FIRST CAUSE OF ACTION

## A. Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5
## B. Promulgated Thereunder Against All Defendants

131.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132.   This cause of action is asserted against all Defendants.

133.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell RINO's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, individually and as a group, took the actions set forth herein.

134.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of RINO as specified herein.

135.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts,

practices, and a course of conduct as alleged herein in an effort to assure investors of RINO's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about RINO and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers RINO securities during the Class Period.

136. Each of the defendants' primary liability, and controlling person liability, arises from the following: (a) defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and (d) defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

137.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing RINO's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' false and misleading statements during the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

138.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for RINO's securities was artificially inflated during the Class Period.

139.   In ignorance of the fact that market prices of RINO's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs

and the other members of the Class acquired RINO's securities during the Class Period at artificially high prices and were damaged thereby.

140.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding RINO's financial results and condition, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired RINO securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

141.   By virtue of the foregoing, the defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

142.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

143.   This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## XI.   SECOND CAUSE OF ACTION

## Violation of Section 20(a) of The Exchange Act
## Against the Individual Defendants

144.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

145.   This Second Claim is asserted against each of the Individual Defendants.

146.   The Individual Defendants, acted as controlling persons of RINO within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

147.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

148.   As set forth above, RINO and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

149.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

150.   This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## XII.   <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.  Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b.  Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

Such other and further relief as the Court may deem just and proper.

Dated: April 18, 2011                    Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         _____
                                         Laurence M. Rosen, Esq. (LR 5733)
                                         333 South Grand Avenue, 25th Floor
                                         Los Angeles, CA 90071
                                         Telephone: (213) 785-2610
                                         Facsimile: (213) 226-4684

Class Action Complaint for Violation of the Federal Securities Laws

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

lrosen@rosenlegal.com

Lead Counsel for Lead Plaintiff and the Class

Class Action Complaint for Violation of the Federal Securities Laws

# EXHIBIT A

**U.S. SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C.**

SECURITIES EXCHANGE ACT OF 1934
Release No. 64291 / April 11 , 2011

SECURITIES AND EXCHANGE COMMISSION SUSPENDS TRADING IN THE
SECURITIES OF RINO INTERNATIONAL CORPORATION

The Securities and Exchange Commission ("Commission") announced the temporary
suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange
Act"), of trading in the securities of RINO International Corporation ("RINO"), a Nevada
corporation with headquarters and operations in the People's Republic of China, at 9:30 a.m.
EDT on April 11, 2011, and terminating at 11:59 p.m. EDT on April 25, 2011.

It appears that there is a lack of current and accurate information concerning the
securities of RINO International Corporation, because the company has failed to disclose
that:  (i) the outside law firm and forensic accountants hired by the audit committee to
investigate allegations of financial fraud at the company resigned on or about March 31,
2011, after reporting the results of their investigation to management and the board;
(ii) the chairman of the audit committee resigned on March 31, 2011; and (iii) the
company's remaining independent directors have also resigned.  Further, questions have
arisen regarding, among other things:  (i) the size of the company's operations and
number of employees; (ii) the existence of certain material customer contracts; and (iii)
the existence of two separate and materially different sets of corporate books and
accounts.

The Commission cautions brokers, dealers, shareholders, and prospective purchasers that
they should carefully consider the foregoing information along with all other currently
available information and any information subsequently issued by the company.  Further,
brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the
Exchange Act, at the termination of the trading suspension, no quotation may be entered
unless and until they have strictly complied with all of the provisions of the rule.  If any
broker or dealer has any questions as to whether or not it has complied with the rule, such
broker or dealer should not enter any quotation but immediately contact the staff in the
Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5760.
If any broker or dealer is uncertain as to what is required by Rule 15c2-11, it should refrain
from entering quotations relating to RINO's securities until such time as it has familiarized
itself with the rule and is certain that all of its provisions have been met.  If any broker or
dealer enters any quotation which is in violation of the rule, the Commission will consider the
need for prompt enforcement action.

If any broker, dealer, or other person has any information which may relate to this matter,
they should immediately contact Kara N. Brockmeyer, Assistant Director, at (202) 551-
4767, or Thomas C. Swiers, Senior Counsel, at (202) 551-4851, or by e-mail at
brockmeyerk@sec.gov or swierst@sec.gov.

## UNITED STATES OF AMERICA
### Before the
## SECURITIES AND EXCHANGE COMMISSION

### April 11, 2011

In the Matter of

**RINO International Corporation,**

**File No.  500-1**

**ORDER OF SUSPENSION
OF TRADING**

It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of RINO International Corporation, because the company has failed to disclose that:  (i) the outside law firm and forensic accountants hired by the audit committee to investigate allegations of financial fraud at the company resigned on or about March 31, 2011, after reporting the results of their investigation to management and the board; (ii) the chairman of its audit committee resigned on March 31, 2011; and (iii) the company's remaining independent directors have also resigned.  Further, questions have arisen regarding, among other things:  (i) the size of the company's operations and number of employees; (ii) the existence of certain material customer contracts; and (iii) the existence of two separate and materially different sets of corporate books and accounts.  RINO is a Nevada corporation with its headquarters and operations in the People's Republic of China, which trades on OTC Link under the symbol "RINO."

The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

Therefore, IT IS ORDERED, pursuant to Section 12(k) of the Securities Exchange Act of 1934, that trading in the above-listed company is suspended for the period from 9:30 a.m. EDT, April 11, 2011, through 11:59 p.m. EDT, on April 25, 2011.

By the Commission.

Elizabeth M. Murphy
Secretary

# EXHIBIT B

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against RINO International Corporation ("RINO"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint against RINO and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in RINO securities during the class period set forth in the complaint. I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Option Contract (Date and strike price) | Date(s) Purchased | Price per Contact | Date(s) Sold to Close (if applicable) | Price Per Contract |
|---|---|---|---|---|
| ~~#1-08-2011~~ | | $ | | $ |
| 01-21-2012 /1.25 | 11/08/10 | $ 250 x3 | 12/10/10 | $ 1.27 |
| 01-21-2012 /1.7 | 11/0/10 | $ 470 x2 | 12/10/10 | $ 1.77 |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

SEE ATTACHED LABELED PAGE 3

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM: (212) 202-3827

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _10_ day of _APRIL_, 2011.

Signature: _____
Name:
Address:

Phone:
E-mail:

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827                    2
OR MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

| Date/Time ▼ | Description | Amount | Net Cash Balance |
|---|---|---|---|
| 12/10/2010 10:59:51 | Sold 4 RINO Jan 21 2012 12.5 Call @ 0.15 | 47.04 | --- |
| 11/11/2010 13:54:18 | Bought 2 RINO Jan 21 2012 12.5 Call @ 2.5 | -511.45 | --- |
| 11/08/2010 11:39:10 | Bought 2 RINO Jan 21 2012 12.5 Call @ 4.7 | -951.45 | --- |

|<   <  Page: [            ]  ▼  >  >|

An indication on this page that an interest payment is "taxable" or "non-taxable" refers to federal taxation only. Interest income may be subject to AMT or state and local taxes. TD Ameritrade does not provide tax advice. Please consult a qualified tax advisor to discuss your individual tax situation.
Non-deposit investment products NOT FDIC INSURED/NO BANK GUARANTEE/MAY LOSE VALUE.
The "Savings Account balance" is the interest-earning cash you hold in a non-sweep savings account at TD Bank USA, N.A. TD Bank USA, N.A. and TD AMERITRADE, Inc. are affiliated through their parent companies.

# EXHIBIT C

| 序号 | 纳税人名称 | 纳税人识别号 | 纳税人税务机关 | 凭证种类 | 全部销售收入 | 增值税 | 申报方式 | 申报日期 | 所属时期起 | 所属时期止 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 12220000.00 | 1200000.00 | 报表申报 | 2010-01-05 | 2009-12-01 | 2009-12-31 |
| 2 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 15100000.00 | 0.00 | 报表申报 | 2009-12-03 | 2009-11-01 | 2009-11-30 |
| 3 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 860000.00 | 0.00 | 报表申报 | 2009-11-03 | 2009-10-01 | 2009-10-31 |
| 4 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 1610000.00 | 0.00 | 报表申报 | 2009-10-12 | 2009-09-01 | 2009-09-30 |
| 5 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 430000.00 | 0.00 | 报表申报 | 2009-09-03 | 2009-08-01 | 2009-08-31 |
| 6 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 200000.00 | 0.00 | 报表申报 | 2009-08-07 | 2009-07-01 | 2009-07-31 |
| 7 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 11080000.00 | 0.00 | 报表申报 | 2009-07-09 | 2009-06-01 | 2009-06-30 |
| 8 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 7200000.00 | 0.00 | 报表申报 | 2009-06-15 | 2009-05-01 | 2009-05-31 |
| 9 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 2090000.00 | 0.00 | 报表申报 | 2009-05-05 | 2009-04-01 | 2009-04-30 |
| 10 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 1040000.00 | 0.00 | 报表申报 | 2009-04-03 | 2009-03-01 | 2009-03-31 |
| 11 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 7870000.00 | 0.00 | 报表申报 | 2009-03-05 | 2009-02-01 | 2009-02-28 |
| 12 | 大连绿诺环境工程科技有限公司 | 2102137443 97709 | 金州区国家税务局 | 2003版增值税纳税申报表(适用于一般纳税人) | 1480000.00 | 0.00 | 报表申报 | 2009-02-05 | 2009-01-01 | 2009-01-31 |
| 合计 | 大连绿诺环境工程科技有限公司 | | | | 61180000.00 | 1200000.00 | | | | |

| Row # | Taxpayer name | Taxpayer registration number | Tax bureau in charge | File name | Total sales revenue | VAT paid | Declaration manner | Declaration date | Beginning date | Ending date |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 12,220,000 | 1,200,000 | Forms | 1/5/10 | 12/1/09 | 12/31/09 |
| 2 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 15,100,000 | - | Forms | 12/3/09 | 11/1/09 | 11/30/09 |
| 3 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 860,000 | - | Forms | 11/3/09 | 10/1/09 | 10/31/09 |
| 4 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 1,610,000 | - | Forms | 10/12/09 | 9/1/09 | 9/30/09 |
| 5 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 430,000 | - | Forms | 9/3/09 | 8/1/09 | 8/31/09 |
| 6 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 200,000 | - | Forms | 8/7/09 | 7/1/09 | 7/31/09 |
| 7 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 11,080,000 | - | Forms | 7/9/09 | 6/1/09 | 6/30/09 |
| 8 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 7,200,000 | - | Forms | 6/15/09 | 5/1/09 | 5/31/09 |
| 9 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 2,090,000 | - | Forms | 5/5/09 | 4/1/09 | 4/30/09 |
| 10 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 1,040,000 | - | Forms | 4/3/09 | 3/1/09 | 3/31/09 |
| 11 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 7,870,000 | - | Forms | 3/5/09 | 2/1/09 | 2/28/09 |
| 12 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | 210213744397709 | State tax bureau of Jinzhou District,Dalian | VAT declaration form (for VAT general payer) | 1,480,000 | - | Forms | 2/5/09 | 1/1/09 | 1/31/09 |
| | Total | | | | 61,180,000 | 1,200,000 | | | | |

Seal: Dalian City Jinzhou District State Tax Bureau

| 序号 | 纳税人名称 | 征收项目 | 所属时间起 | 所属时间止 | 税额 |
|---|---|---|---|---|---|
| 1 | 大连绿诺环境工程科技有限公司 | 残疾人就业保障 | 2009-1-1 | 2009-12-31 | 13985.44 |
| 2 | 大连绿诺环境工程科技有限公司 | 城建税 | 2009-1-1 | 2009-12-31 | -18005.91 |
| 3 | 大连绿诺环境工程科技有限公司 | 地方教育费 | 2009-1-1 | 2009-12-31 | -2572.27 |
| 4 | 大连绿诺环境工程科技有限公司 | 房产税 | 2009-1-1 | 2009-12-31 | 258855.84 |
| 5 | 大连绿诺环境工程科技有限公司 | 个人所得税 | 2009-1-1 | 2009-12-31 | 297617.76 |
| 6 | 大连绿诺环境工程科技有限公司 | 工会经费（筹备） | 2009-1-1 | 2009-12-31 | 140002.81 |
| 7 | 大连绿诺环境工程科技有限公司 | 教育费附加 | 2009-1-1 | 2009-12-31 | -7716.82 |
| 8 | 大连绿诺环境工程科技有限公司 | 土地税 | 2009-1-1 | 2009-12-31 | 238992 |
| 9 | 大连绿诺环境工程科技有限公司 | 印花税 | 2009-1-1 | 2009-12-31 | 87595.64 |
| 10 | 大连绿诺环境工程科技有限公司 | 营业税 | 2009-1-1 | 2009-12-31 | 4800 |

2009年纳税合计：人民币963554.49元

| Row number | Taxpayer name | Tax category | Beginning date | Ending date | Tax paid |
|---|---|---|---|---|---|
| 1 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | Employment security fund for handicapped person | 1/1/09 | 12/31/09 | 13,985.44 |
| 2 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | Urban construction tax | 1/1/09 | 12/31/09 | (18,005.91) |
| 3 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | Local educational surcharges | 1/1/09 | 12/31/09 | (2,572.27) |
| 4 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | Urban real estate tax | 1/1/09 | 12/31/09 | 258,855.84 |
| 5 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | Individual income tax | 1/1/09 | 12/31/09 | 297,617.76 |
| 6 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | Labor union fund | 1/1/09 | 12/31/09 | 140,002.81 |
| 7 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | Educational surcharges | 1/1/09 | 12/31/09 | (7,716.82) |
| 8 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | Land use tax | 1/1/09 | 12/31/09 | 238,992.00 |
| 9 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | Stamp duty | 1/1/09 | 12/31/09 | 37,595.64 |
| 10 | Dalian Rino Environment Engineering Science and Technology Co.,Ltd | Business tax | 1/1/09 | 12/31/09 | 4,800.00 |

Total tax payment in 2009:                                                                 963,554.49

Seal: Dalian City Jinzhou District Local Tax Bureau

# EXHIBIT D

EXHIBIT D

The following is a chart showing details of Plaintiffs' investigation of RINO's customers conducted by Plaintiffs' investigator in the PRC.

| | Customers Name and Location of Statement | Plaintiffs' Findings | Conclusion |
|---|---|---|---|
| 1 | Jinan Iron and Steel Co., ("Jinan") Stated in 2008 10-K, 2009 10-K and March Presentation. | a. Plaintiffs' investigator called Jinan and was told by a Mr. Li that RINO did a project for Jinan in 2006. Mr. Li also said that Jinan has not been a customer of RINO since 2006. | In 2007, 2008, 2009, and 2010 Jinan was not a customer of RINO. |
| 2 | Panzhihua Iron & Steel ("Panzhihua") Stated in 2008 10-K, 2009 10-K and March Presentation. | a. Plaintiffs' investigator called Panzhihua and was told RINO completed its 360m2 FGD project in 2008.<br>b. A summary of FDG projects in China posted on Chinese Energy Environmental website showed the project cost was $7.4 million (RMB50.53 million).[1] | a. In 2008, Panzhihua was RINO's customer, but the contributed revenue was only $7.4 million.<br>b. In 2009 and 2010 Panzhihua was not a customer of RINO. |

---

1 http://jishu.eppbbs.com/thread-89049-1-1.html

EXHIBIT D

| 3 | Handan Iron & Steel ("Handan") Stated in 2008 10-K, 2009 10-K and March Presentation. | a. A local newspaper reported that RINO completed a 400m2 FGD project for Handan on December 30, 2008. The contract price was $6.9 million (RMB 47 million).[2]<br><br>b. This is the only information obtained through different sources regarding RINO's contract with Handan. | a. In 2008, Handan was RINO's customer.<br><br>b. In 2009 and 2010, Handan was not a customer of RINO. |
|---|---|---|---|
| 4 | Hunan Lianyuan Iron & Steel ("Hunan Lianyuan") Stated in 2008 10-K and 2009 10-K. | a. Plaintiffs' investigator called Hunan Lianyuan and was told RINO built a CFB system in 2009 for a 360 m2 sinter, and in 2010 for a 280 m2 sinter.<br><br>b. A summary of FDG projects on in China posted on Chinese Energy Environmental website showed the 280 m2 sinter project cost was $10.2 million (RMB70 million).[3] | In 2008 and 2009 Hunan was RINO's customer. |
| 5 | Nanchang Changli Iron & Steel ("Nanchang") Stated in 2008 10-K and 2009 10-K. | a. Plaintiffs' investigator called and was told RINO only did a wastewater system for Nanchang in 2008, with a contract price of $1.17 million (RMB 8 million). | a. In 2008, Nanchang was RINO's customer, but the contributed revenue was only $1.17 million.<br><br>b. In 2009 and 2010, Nanchang was not RINO's customer. |

2 http://www.handannews.com.cn/epaper/zysb/html/2008-12/31/content_5225690.htm
3 http://jishu.eppbbs.com/thread-89049-1-1.html

EXHIBIT D

| 6 | Zhuhai Yueyufeng Iron & Steel ("Yueyufeng")<br><br>Stated in 2008 10-K, 2009 10-K and March Presentation.[4] | a. A Chinese government website dated April 9, 2010 showed that Zhuhai Guang Jing and Hunan Industrial Equipment were the designer and builder of Yueyufeng's FGD system.[5]<br><br>b. Zhuhai Guang Jing put a picture of Yueyufeng's project on its website as an example project.[6]<br><br>c. Hunan Industrial Equipment reported construction progress of Yueyufeng's project on its website. It stated the project started in May 2009 and expected to complete by end of June, 2009.[7] | In 2008, 2009 and 2010, Yueyufeng was not a customer of RINO. |
| --- | --- | --- | --- |
| 7 | Chongqing Iron & Steel ("Chongqing")<br><br>Stated in 2009 10-K. | a. A Chinese website showed Chongqing was soliciting for bids for a FGD project in December 2010.[8]<br><br>b. Plaintiffs' investigator called and was told by a Ms. Yu that Chongqing was not RINO's customer. Chongqing once discussed with RINO on potential project, but no project was ever carried out.<br><br>c. Muddy Water Report also stated that "…Chongqing is currently building its first FGD system… Specifically, RINO is not a vendor." | In 2008, 2009 and 2010, Chongqing was not a customer of RINO. |

---

4 RINO stated in the March Presentation that sales to Yueyufeng amounting to 9.1% of sales in 9M 2009.

5 http://www.zhuhai-port.com/show.aspx?flag=0&columnID=89&id=1152

6 http://www.gjhb.com.cn/UploadFiles/2009869593159.jpg

7 http://www.hnaz.com.cn/Magazine/ArticleInfo.aspx?articleid=292&termId=22&bookid=2&menu_id=108&pid=106

8 http://www.zhaobiao.gov.cn/noticedetail/25785574.html

EXHIBIT D

| 8 | Yuhua Iron & Steel ("Yuhua") Stated in 2008 10-K and 2009 10-K. | a. Local government website showed the local EPA requires Yuhua to complete its FGD project before May 2010.[9] <br><br> b. According to Muddy Water Report, "our contact reported that Yuhua only has one FGD system, and that RINO was not the vendor." <br><br> c. Plaintiffs' investigator contacted Yuhua to confirm Muddy Waters Report but Yuhua refused to discuss the matter. | In 2008, 2009 and 2010, Yuhua was not a customer of RINO. |
|---|---|---|---|
| 9 | Zhangdian Iron & Steel ("Zhangdian") Stated in 2009 10-K. | a. Shandong Guoshun's website (a RINO competitor) showed that it built Zhangdian's FGD project, not RINO.[10] <br><br> b. A local news website reported that Zhangdian's FGD project was completed and it applied to commence operations on February 19, 2011, with a total cost of $2.8 million (RMB19 million).[11] | In 2008, 2009 and 2010, Zhangdian was not a customer of RINO. |
| 10 | Shengfeng Iron & Steel ("Shengfeng") Stated in 2008 10-K and 2009 10-K. | Plaintiffs' investigator called Shengfeng and was told by a Mr. Hao that RINO completed Phase one of a FGD project for it in 2010. Mr. Hao also confirmed that RINO did not do any project for it in 2008 and 2009. | In 2008 and 2009, Shengfeng was not a customer of RINO. |

9http://www.hbj.hd.gov.cn/wa/ReadNews.asp?NewsID=2403&BigClassName=%C1%EC%B5%BC%BD%B2%BB%B0&SmallClassName=%C1%EC%B5%BC%BD%B2%BB%B0&SpecialID=0

10 http://www.sdgs.com.cn/alinfo/?857.html

11 http://zb.cenn.cn/info/nid_57650.html

EXHIBIT D

| 11 | Kunming Iron & Steel ("Kunming") Stated in 2008 10-K and 2009 10-K. | Plaintiffs' investigator tried several times but was unable to contact the company. After substantial PRC governmental and online database searches, investigator could not find any information about this company's FGD project. | Not sure whether Kunming is a customer of RINO in 2008 and 2009. |
|---|---|---|---|
| 12 | Qianjing Iron & Steel ("Qianjing") Stated in 2008 10-K and 2009 10-K. | Plaintiffs' investigator tried several times but was unable to contact the company. After substantial PRC governmental and online database searches, investigator could not find any information about this company's FGD project. | Not sure whether Qianjing is a customer of RINO in 2008 and 2009. |
| 13 | Hefei Iron &Steel ("Hefei") Stated in 2009 10-K. | Plaintiffs' investigator tried several times but was unable to contact the company. After substantial PRC governmental and online database searches, investigator could not find any information about this company's FGD project. | Not sure whether Hefei is a customer of RINO in 2008 and 2009. |
| 14 | Jiangsu Xigang Iron &Steel ("Xigang") Stated in 2009 10-K. | Plaintiffs' investigator tried several times but was unable to contact the company. After substantial PRC governmental and online database searches, investigator could not find any information about this company's FGD project. | Not sure whether Xigang is a customer of RINO in 2008 and 2009. |

EXHIBIT D

| 15 | Benxi Iron & Steel Group ("Benxi") <br><br> Stated in March Presentation. | a. An academic article mentioned that in 2006 Hunan Xiangbei built a FGD project for Benxi.[12] <br> b. A Chinese government website reported that on October 22, 2010, Benxi signed contract for 2x265M2 FGD with Liuhe Tianrong.[13] | In 2007, 2008, 2009 and 2010, Benxi was not a customer of RINO. |
|---|---|---|---|
| 16 | Bao Gang Group ("Bao Gang") <br><br> Stated in March Presentation. | Plaintiffs' investigator called Bao Gang and was told by a person from Energy and Environmental Protection Dept. that Bao Gang was never a customer of RINO. | In 2007, 2008, 2009 and 2010, Bao Gang was not a customer of RINO. |
| 17 | Lai Steel Group("Lai") <br><br> Stated in March Presentation. | a. A Chinese website showed Shandong Yejin Design built Lai's FGD project.[14] <br> b. Muddy Water Report stated that "Lai has two FGD systems, and no work was contracted or sub-contracted to RINO. Our contact at Lai is familiar with RINO because he heard that the FGD system RINO built for Jinan Iron & Steel was taken off line." | In 2007, 2008, 2009 and 2010, Bao Gang was not a customer of RINO. |
| 18 | Tangshan Bei Steel Group ("Tangshan Bei") <br><br> Stated in March Presentation. | After substantial PRC governmental and online database searches, investigator could not find any company of this name. | In 2009, Tangshan Bei was not a customer of RINO. |

12 http://emuch.net/journal/article.php?id=CJFDTotal-BXGZ200702015
13 http://www.hnys.gov.cn/Read.asp?IC_ID=95794
14 http://www.chinamining.com.cn/news/LISTNEWS.ASP?classid=159%20&siteid=283501

EXHIBIT D

| | | | |
|---|---|---|---|
| 19 | Shougang Jingtang Iron & Steel Co., Ltd ("Shougang Jingtang") Stated in Q1 2010  10-Q. | A Chinese website shows Shougang works with RINO and completed a FGD project in November 2010. | In 2010, Shougang was a customer of RINO. |
| 20 | Baotou Iron and Steel Group ("Baotou") Stated in Q1 2010  10-Q. | a. A Chinese website shows that Beikeda Lianchuang built the FGD project for Baotou in 2006.[15]<br>b. Muddy Water Report stated that "We spoke with a senior Bao executive who was responsible for installing FGD systems on three of Bao's sinters (including at a subsidiary). The executive had never heard of RINO." | In 2010, Baotou was not a customer of RINO. |
| 21 | Sichuan Steel Factory ("Si Chuan") Stated in Q1 2010  10-Q. | After substantial PRC governmental and online database searches, investigator could not find any company of this name. | In 2010, Si Chuan was not a customer of RINO. |
| 22 | Zhongtian Iron and Steel Co., Ltd ("Zhongtian") Stated in Q1 2010  10-Q. | A Chinese website shows that Jiangsu Yuxing built Zhongtian's FGD project in 2010.[16] | In 2010, Zhongtian was not a customer of RINO. |

15 http://www.csteelnews.com/shequ/qiyelaifeng/5004.html
16 http://www.steelinfo.com.cn/gangcai/gczx_news.asp?col=gczx&id=78408