O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN HUFNAGLE, individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br><br>   v.<br><br>RINO INTERNATIONAL CORPORATION, DEJON ZOU, JENNY LIUE, BEN WANG, LI YU, KENNITH C. JOHNSON, JIANPING QIU, ZIE QUAN, and ZEJIN LI,<br><br>             Defendants. | Case No. CV 10-08695 DDP (VBKx)<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT**<br><br>[Dkt. No. 247] |

Presently before the court is Defendant Frazer Frost, LLP ("Frazer Frost" or "the Auditor")'s Motion to Dismiss Plaintiff's Third Amended Complaint ("TAC"). Having considered the submissions of the parties, the court is inclined to deny the motion and adopt the following order.

**I. Background**

As explained in the court's earlier orders, this case is a purported class action alleging violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78 *et seq.* (the "Exchange Act")

brought on behalf of a class consisting of all persons and entities who purchased publicly traded Rino International Corporation ("Rino") common stock and call options, and who sold put options of Rino, between March 31, 2009 and November 17, 2010 (the "Class Period"). The TAC alleges that RINO engaged in a wide-ranging fraud regarding its industrial equipment business in China. (TAC ¶¶ 4-5.) Plaintiff alleges, for example, that RINO grossly overstated its revenue and profits, fabricated contracts with nonexistent customers, understated its tax liabilities, and concealed transactions between RINO and other companies owned by RINO's CEO's relatives. (TAC ¶ 5.) Pursuant to a settlement agreement, Plaintiff has dismissed all claims against all Defendants, with the exception of Frazer Frost. (Dkt. No. 235.)

Plaintiff alleges that auditor Frazer Frost either knowingly or recklessly ignored obvious signs of financial irregularities and failed to follow generally accepted auditing standards in its review of RINO's financial statements. (TAC ¶¶ 7-25, 42-51, 133-204.) The TAC alleges that on March 31, 2010, Frazer issued false opinions regarding RINO's financial statements. Specifically, Plaintiff alleges that Frazer Frost's audit opinion regarding RINO's 2009 annual report falsely represented that RINO's financial statements conformed with generally accepted accounting principles ("GAAP"). (TAC ¶ 134.) Frazer Frost now moves to dismiss the TAC.

**II. Legal Standard**

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,

570 (2007)).  When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).  Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678.  Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." Id. at 679.  In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. Id. at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." Id. at 679.  Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." Twombly, 550 U.S. at 555. "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, plaintiffs must plead particularized facts demonstrating "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction

3

and loss causation, and (5) economic loss." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009). A complaint alleging securities fraud under the Private Securities Litigation Reform Act of 1995 ("PSLRA") must meet a heightened pleading standard. The PSLRA requires that any securities fraud claim "[s]pecify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. Section 78u-4(b)(1), (b)(2).

**III. Discussion**

 A. Scienter

  Defendant argues that Plaintiff has failed to plead particularized facts supporting a strong inference of scienter. When analyzing a defendant's intent, courts must view complaints holistically, and should deny a motion to dismiss if the inference of scienter advanced by plaintiffs is "at least as compelling as any opposing inference one could draw from the facts alleged." Matrixx Initiatives, Inc. v. Siracusano, 141 S. Ct. 1309, 1324 (2011) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007); see also New Mexico State Investment Council v. Ernst & Young LLP, 641 F.3d 1089, 1095 (9th Cir. 2011) ("NMSIC").[1] In the auditing context, a plaintiff must show that "accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to

---

[1] Where any individual allegation is sufficient to create a strong inference of scienter, the court need not necessarily conduct a "holistic" review of the allegations in their entirety. NMSIC, 641 F.3d at 1095 (citing Zucco, 552 F.3d at 991-992).

4

investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions . . . ." NMSCIC, 641 F.3d at 1098 (quotation marks and citation omitted). Allegations of a poor audit, absent intent to deceive, will not suffice. Id.

### 1. Tax returns and multiple sets of books

Plaintiff alleges that RINO kept two sets of corporate books, and that Frazer had actual knowledge of this improper accounting. Frazer approved RINO's report that it had $192.6 million in revenue and a $56.4 million profit in 2009 and $139.3 million in revenue and $25.5 in profit for 2008. (TAC ¶ 16.) RINO's Chinese income tax returns, however, indicated 2009 revenue of $11.1 million and profit of $80,000 and 2008 revenue of $15.7 million and profit of $1.2 million. (TAC ¶ 14.) RINO's Chinese Value Added Tax ("VAT") return showed 2009 revenue of only $9 million. (TAC ¶ 15.) Thus, the reports approved by Frazer listed revenues and profits between ten and twenty times higher than the figures reported in RINO's tax documents. Plaintiff argues that the conflict between the tax documents and RINO's financial statements indicates that RINO was keeping two sets of books and providing inflated numbers to investors. (Reply at 10.) Indeed, the TAC alleges that the Securities and Exchange Commission ultimately suspended trading in RINO securities in part because of the existence of two separate and materially different sets of corporate books and accounts. (TAC ¶ 35.)

The TAC further alleges that Frazer was aware of the discrepancy between RINO's tax returns and reported revenue, and therefore knew that RINO was cooking the books to mislead

5

investors. (TAC ¶ 13.) On March 29, 2010, Frazer sent a letter to RINO's management highlighting several "significant deficiencies" in RINO's internal financial controls. (TAC, Ex. C.) This letter noted that RINO was not current on its issuance or receipt of VAT invoices, and explicitly stated that "[w]hen the Company files the tax return with the Chinese Government Tax Bureau, the reportable book amount does not agree with the tax return for both the VAT tax return and income tax return." (Id.) Nevertheless, Frazer did not consider this conflict to be a "material weakness" in RINO's financial report. (Id.) Frazer's letter nevertheless suggested that RINO change the way it accounted for VAT on both the sales and purchase sides of RINO's business. (Id.)

The court must compare the both the innocent and malicious inferences supported by the alleged facts. NMSIC, 641 F.3d at 1095. Plaintiff argues that Frazer's decision to approve RINO's financial statements, despite Frazer's knowledge of the discrepancy with the tax return numbers, supports the inference that Frazer knew its opinion that RINO complied with GAAP to be false. (Replay at 10-11.)

Frazer contends that its recognition of the deficiency in RINO's figures demonstrates Frazer's diligence, and that Frazer's decision to label the conflicting figures a "significant deficiency" rather than a "material weakness" was the result of considered professional judgment. (Opposition at 13-14.) Frazer argues that the difference between the Chinese tax figures and RINO's reported income and profit numbers was the result of differences between Chinese tax law and SEC accounting rules, which attach tax liability at different stages of a transaction. (Opp.

6

at 13.)  For this reason, Frazer asserts, it suggested RINO change the way it handled VAT payments and receipts to address this serious, but not fundamental, issue with its VAT accounting. Frazer further argues that the difference between the tax returns and SEC filings does not demonstrate the existence of two sets of books because the returns referenced in and attached to the complaint only apply to a single RINO subsidiary.  Its SEC filing, however, included figures from all RINO entities.

The facts alleged support the inference that Frazer approved fraudulent figures.  That inference, however, is at odds with Frazer's explicit identification of the accounting weakness and suggestion of a course of action to remedy it.  The potential alternative explanations for the competing revenue figures, particularly the limited scope of the Chinese tax returns, lend further weight to the innocent inference here.  A fraudster of even minimal competence would be unlikely to ignore such a blatant impropriety as maintaining two sets of books, yet at the same time identify and criticize that improper practice.  Frazer's knowledge of the differing reported financial figures, therefore, is not alone sufficient to support a strong inference of scienter.

### 2. Reliance Upon Nonexistent Contracts

RINO's internal documents indicate that RINO earned $11.1 million from its contracts in 2009 and $15.75 million in 2008. (TAC ¶ 98(e).)  These figures are consistent with those indicated in RINO's tax forms and, like those figures, represent only a fraction of the revenues stated in the financial report approved by Frazer.  Plaintiff alleges that RINO improperly used a "percentage of completion" method to record revenue based on contracts that

7

were not finalized.[2] (TAC ¶ 10). The TAC further alleges that Frazer not only knew that RINO improperly used percentage of completion accounting, but affirmatively directed RINO to utilize that method in ways that violated GAAP. (TAC ¶ 11.) For example, the TAC alleges that Frazer told RINO to include in its 2009 revenue contracts that were not signed or did not take effect until 2010, after the applicable reporting period. (Id.)

The TAC further alleges that many of the RINO customers listed in RINO's report either did not exist or had not purchased goods or services from RINO.[3] (TAC ¶¶ 123, 167-179.) Plaintiffs contend that Frazer failed to adequately check the status of the supposed customers and contracts, even though RINO's CEO told Frazer that some customer contracts were merely incomplete "framework agreements," and that "there were (sic) some uncertainty about execution of the framework agreements." (TAC ¶¶ 47, 170.) The TAC acknowledges, however, that Frazer did send some sort of confirmation form to RINO's purported customers. (TAC ¶ 176.)

Plaintiff argues that auditing standards required Frazer to conduct a certain type of investigation of RINO's customers. (Opp. at 17; TAC ¶ 165). Specifically, the TAC cites to Public Company Accounting Oversight Board ("PCAOB") auditing standard sections AU

---

[2] Under the percentage of completion method, revenue on long-term projects is recognized based on the percentage of work completed to date. In re Daou Systems, Inc., 411 F.3d 1006, 1012-13 (9th Cir. 2005).

[3] While Plaintiff argues that up to 40% of the listed customers did not purchase anything from RINO or did not exist, that figure appears to include listed customers that Plaintiff's investigator was not able to contact.

8

311, 319, and 326.[4]  Nowhere, however, does the TAC or Plaintiff's opposition specify the subsections of those lengthy auditing standards with which Frazer failed to comply.  Indeed, Plaintiff's opposition makes no mention of AU sections 311, 319, or 326.  Instead, Plaintiff's opposition conclusorily asserts, without citation, that "PCAOB auditing standards for percentage of completion accounting required that Frazer obtain confirmation of more information that simply the amount the customer believed it currently owed RINO." (Opp. at 17.)  Though Plaintiff makes some limited references to the American Institute of Certified Public Accountant's Construction Contractors Audit & Accounting Guide, PCAOB standards make clear that such guides are recommendations, not auditing standards.  AU § 150.05.  Thus, while Plaintiff has alleged that Frazer could have performed a different or more thorough investigation of RINO's customers, Plaintiff has not alleged any specific facts related to percentage of completion accounting that alone indicate that Frazer violated accounting standards or support a strong inference of scienter.

   3.  Additional "red flags" and holistic review

If no individual allegation in sufficient to support a strong inference of scienter, the court must proceed to conduct a "holistic" review of those same allegations.  NMSIC, 641 F.3d at 1095.  Allegations insufficient on their own may nevertheless, in combination, create a strong inference of recklessness or intentional conduct.  Id.  "[T]he more facts alleged that should

---

[4] Neither party includes these auditing standards with their pleadings.  AU sections 311, 319, and 326 have all been superseded, effective December 15, 2010, but remain available at www.pcaobus.org.

cause a reasonable auditor to investigate further before making a representation, the more cogent and compelling a scienter inference becomes." Id. at 1098.

The irregularities described above, though insufficient to establish scienter on their own, more readily support an inference of wrongdoing when viewed as a whole, alongside other allegations. Frazer Frost knew that the revenue and profit numbers reported on RINO's tax returns did not match the figures reported to investors. The revenue numbers based on RINO's purported contracts matched the lower tax return numbers, not the higher figure approved by Frazer. Regardless whether Frazer's investigation of RINO customers conformed to accounting standards, Frazer knew that RINO was utilizing percentage of completion methods to reach its revenue figures, in part because Frazer advised RINO to do just that. Though Plaintiff has not identified any particular accounting standard related to percentage of completion, to the extent that Frazer advised RINO to count revenue from unsigned, unexecuted contracts, the parties appear to agree that inclusion of such revenue would be improper.

These are not the only allegations that might give rise to suspicion. The TAC alleges that RINO claimed a 100% income tax exemption in 2008. (TAC ¶ 78(f).) By the end of 2008, RINO had advanced $22 million in cash to two of its major suppliers of raw materials. (TAC ¶ 95.) (TAC ¶ 96.) In 2009, RINO 93% of RINO's purchases, or $79.4 million of raw materials, came from these two suppliers alone. (TAC ¶ 104.) One of the two suppliers was owned by RINO's CEO's nephew, and had no phone number or website. (TAC ¶¶ 106-107.) Neither did the larger of the two suppliers, which

10

did not exist before 2007, had no revenue in 2009, and was owned by RINO's CEO's mother. (TAC ¶¶ 108, 110.) By the end of 2009, RINO had advanced over $34 million to these two suppliers.[5] (TAC ¶ 112.)

RINO was generous not only to its CEO's relatives, but also to the CEO himself. In 2009, as disclosed in the Frazer-approved report, RINO gave its CEO an interest-free, unsecured loan of $3.5 million for the purchase of a personal residence in California. (TAC ¶ 131.) As described above, Frazer has identified reasonable inferences that could be drawn from certain individual allegations. Frazer's argument that the allegations regarding millions of dollars in cash advances do not establish scienter because Plaintiffs have failed to allege that such advances are "contrary to standard Chinese business practices or were otherwise commercially unreasonable" is far less persuasive.[6] (Opposition at 11.)

The question before the court at this stage is, "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Tellabs, 551 U.S. at 326. Viewed as a whole, the totality of the allegations supports fraud. Allegations of tens millions of dollars in cash advances to a small number of shadowy suppliers, a claimed 100% income tax exemption, millions of

---

[5] Though it is unclear from the complaint whether Frazer saw or should have seen certain Chinese filings, RINO's Chinese filings listed $0 in advances at the end of both 2008 and 2009. (TAC ¶¶ 96, 112.)

[6] Frazer does not directly address the personal loan to RINO's CEO or the improperly claimed tax credit.

11

dollars in unsecured loans to corporate officers, wildly divergent revenue and profit figures, and the inclusion of admittedly uncertain "framework agreements" as revenue provide far more support to the inference that Frazer knowingly or recklessly approved RINO's fraudulent financial statements than to the competing inferences that RINO's figures were the result of China's tax rules, innocent misapplication of accounting methods, or standard business practices. Plaintiff's has sufficiently alleged scienter.[7]

**IV. Conclusion**

For the reasons stated above, Frazer Frost's Motion to Dismiss is DENIED.

IT IS SO ORDERED.

Dated: August 1, 2013

                                      DEAN D. PREGERSON
                                      United States District Judge

---

[7] Frazer also argues that Plaintiff has failed to demonstrate subjective falsity "for the same reasons that Plaintiff has failed to demonstrate scienter." (Mot. at 19.) Because Plaintiffs have adequately pled scienter, their subjective falsity allegations also suffice.

12