BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (175783)
Albert Y. Chang (296065)
Yury A. Kolesnikov (271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:     (858) 914-2001
Facsimile:      (858) 914-2002
E-mail:         fbottini@bottinilaw.com
                achang@bottinilaw.com
                ykolesnikov@bottinilaw.com

*Attorneys for Objector Norman Miller*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STREAM SICAV, TODD MARX, JOHN DORMAN, and LEE KARLSON, individually and on behalf of all others similarly situated, | Case No. CV-10-8695-DDP (VBKx) |
| | CLASS ACTION |
| | **OBJECTIONS OF NORMAN MILLER TO THE PROPOSED SETTLEMENT** |
| Plaintiffs, | |
| vs. | Date:       February 1, 2016 |
| | Time:       11:00 a.m. |
| RINO INTERNATIONAL CORPORATION, DEJUN ZOU, JIANPING QIU, YI JENNY LIU, BEN WANG, KENNITH C. JOHNSON, XIE QUAN, WEIGUO ZHANG, LI YU, and FRAZER FROST, LLP f/k/a MOORE STEPHENS WURTH FRAZER AND TORBET, LLP, | Judge:      Hon. Dean D. Pregerson |
| | Courtroom:   3 |
| Defendants. | |

## Table of Contents

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 2

    A.   Factual Background ................................................................................ 2

    B.   The California Action's Procedural History ............................................ 4

    C.   Previous Settlement with the RINO Defendants .................................... 5

    D.   The Nevada Action's Procedural History ............................................... 6

    E.   The California Plaintiffs' Settlement with Frazer Frost and Initial Refusal to Exclude Any of the Nevada Plaintiffs' Claims ................................... 8

    F.   The Revised Settlement .......................................................................... 9

III.  LEGAL STANDARD ...................................................................................... 10

IV.   ARGUMENT .................................................................................................... 12

    A.   The Proposed Settlement Is Not Fair or Reasonable Because It Includes an Overbroad Release that Purports to Release Claims that Could Not Have Been Asserted in This Action, Including the Nevada Plaintiffs' Direct, State-Law Claims that Are Currently Pending in the Nevada Action ................................................................................................. 12

        1.   The Proposed Release Goes Far Beyond the Claims Asserted in This Action by Attempting to Release "Holder" Claims that Are Not — and Could Not Have Been — Asserted in This Action ........................ 12

        2.   The Proposed Release Improperly Attempts to Release the Nevada Plaintiffs' Direct, State-Law Claim for Aiding and Abetting Breaches of Fiduciary Duties that Is Currently Pending in the Nevada Action ... 14

    B.   Conditional Class Certification for Settlement Purposes Is Not Appropriate Because the California Plaintiffs Cannot Adequately Represent the Nevada Plaintiffs and the Nevada Action Class as to Their Direct, State-Law Claim for Aiding and Abetting Breaches of Fiduciary Duties .................................................................................................... 17

    C.   The Amount of the Proposed Settlement Is Woefully Inadequate ........ 19

V.    CONCLUSION ................................................................................................ 21

Objections of Norman Miller to the Proposed Settlement

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Table of Authorities

**Cases**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591(1997) ...................................................................................11, 17

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975) ...................................................................................1, 13

*Dennis v. Kellogg Co.*,
  697 F.3d 858 (9th Cir. 2012) ..............................................................10, 11, 12

*Ferrington v. McAfee, Inc.*,
  No. 10-CV-1455-LHK,
  2012 WL 1156399 (N.D. Cal. Apr. 6, 2012).......................................13, 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) .............................................................................. 13

*Hamilton v. Nozko*,
  Civ. A. No. 13014,
  1994 WL 413299 (Del. Ch. July 27, 1994) ............................................. 15

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998)................................................................11, 12

*Hesse v. Sprint Corp.*,
  598 F.3d 581 (9th Cir. 2010) ..................................................................17, 18

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ................................................................. 10

*In re Crazy Eddie Sec. Litig.*,
  824 F. Supp. 320 (E.D.N.Y. 1993) ........................................................ 20

*Kakani v. Oracle Corp.*,
  No. C 06-06493 WHA,
  2007 WL 1793774(N.D. Cal. June 19, 2007)........................................ 10

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ................................................................. 11

Objections of Norman Miller to the Proposed Settlement

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
    547 U.S. 71 (2006) ................................................................................. 13

*Mirfashi v. Fleet Mortg. Corp.,*
    356 F.3d 781 (7th Cir. 2004) ........................................................... 13, 16

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco,*
    688 F.2d 615 (9th Cir. 1982) .............................................................. 11

*Sobel v. Hertz Corp.,*
    No. 3:06-cv-0545-LRH-RAM,
    2011 WL 2559565 (D. Nev. June 27, 2011) ................................... 10, 11

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ........................................................... 10, 11

*Stokes v. Interline Brands, Inc.,*
    No. 12-cv-05527-JD,
    2014 WL 5826335 (N.D. Cal. Nov. 10, 2014) ..................................... 10

*Torrisi v. Tucson Elec. Power Co.,*
    8 F.3d 1370 (9th Cir. 1993) .................................................................. 20

**Rules and Statutes**

FED. R. CIV. P. 23(e) ................................................................................ 10, 11

FED. R. CIV. P. 23(e)(2) ................................................................................ 10

Securities Exchange Act of 1934
    § 10(b) ..................................................................................... 4, 5, 12, 13

Securities Litigation Uniform Standards Act of 1998,
    Pub. L. No. 105-353,
    112 Stat. 3227 .......................................................................................... 8

Securities Litigation Uniform Standards Act of 1998,
    Pub. L. No. 105-353,
    112 Stat. 3227 .......................................................................................... 8

Objections of Norman Miller to the Proposed Settlement

**Other Authorities**

Denise N. Martin *et al.*, National Economic Research Associates, Inc.,
   *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions*,
   5 STAN. J. L. BUS. & FIN. 121, 123 (1999) ................................................................. 19

Ellen M. Ryan & Laura E. Simmons, Cornerstone Research,
   *Securities Class Action Settlements: 2010 Review and Analysis* ......................................... 20

Objections of Norman Miller to the Proposed Settlement

Norman Miller, a shareholder of RINO International Corporation ("RINO" or the "Company"), respectfully submits this memorandum of points and authorities in support of his objections to the proposed settlement memorialized in the Amended Stipulation of Settlement dated October 12, 2015 (the "Stipulation"), Dkt. No 288.[1]

## I.   INTRODUCTION

The Court should deny final approval of the proposed settlement in this action ("California Action") for three reasons.

*First*, the proposed settlement is not fair or reasonable because it contains an overly broad release that, among other things, purports to release claims of RINO shareholders who merely *held* RINO stock during the Class Period. This is inappropriate because the federal securities laws only provide remedies for persons who *purchase* or *sell* securities based on false or misleading statements or material omissions; they do not provide remedies for "holders." *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 738–40, 749 (1975).

Notably, the proposed settlement improperly attempts to release the direct, state-law claim that is currently pending in the District of Nevada on behalf of shareholders who held RINO stock after the delisting of RINO's stock on December 8, 2010. *See In re RINO Int'l Corp. Derivative Action*, Case No. 3:15-cv-00400-RCJ-VPC (D. Nev.) ("Nevada Action").[2] As Mr. Miller and Richard Elipani (collectively, the "Nevada Plaintiffs") previously advised the Court, the question as to whether the Nevada Plaintiffs' direct, state-law claim alleges an untrue statement or omission of material fact in connection with a purchase or sale of security is currently pending before the Honorable Robert C. Jones in the Nevada Action. A hearing on that issue is currently scheduled for January 19, 2016. If Judge Jones determines that the Nevada Plaintiffs' direct, state-law claim does *not* allege an untrue

---

[1] This memorandum adopts all of the defined terms in the Stipulation.

[2] The Nevada Action was improperly removed from the First Judicial District Court of the State of Nevada in and for Carson City, Case No. 10-OC-005291 B. A motion to remand is currently pending and is scheduled to be heard on January 19, 2016.

Objections of Norman Miller to the Proposed Settlement

statement or omission of material fact in connection with a purchase or sale of security that conclusion would, *a fortiori*, mean that the claim *cannot* be released in this action. Accordingly, as a matter of comity, this Court should not finally approve the Stipulation before Judge Jones rules on the Nevada Plaintiffs' pending motion to remand as well as the motion to dismiss filed by defendants Moore Stephens Wurth Frazer and Torbet, LLP ("MSWFT") and Frazer Frost, LLP ("Frazer Frost") (collectively, "Auditor Defendants"). Otherwise, the Auditor Defendants will obtain through the proposed settlement what they could not obtain in the litigation — a "back door" dismissal of the direct, state-law claim in the Nevada Action — all to the detriment of RINO shareholders.

*Second*, conditional class certification for settlement purposes is not appropriate because, as relevant to the delisting of RINO stock, the plaintiffs in the California Action cannot adequately represent the claims of the Nevada Plaintiffs and all other shareholders of RINO who held RINO stock after the delisting of RINO stock on December 8, 2010, because these shareholders suffered an additional *and separate* injury due to the delisting.

*Third*, the Court should deny final approval because the proposed settlement is woefully inadequate.  The proposed settlement offers RINO shareholders only $1,685,000, which represents a mere 2.79% of the potential maximum damages (or 1.65%, once the requested attorneys' fees, expenses, and incentive awards are subtracted).  This is particularly inadequate in light of the fact that Frazer Frost has $15 million worth of insurance policies providing coverage for the plaintiffs' claims.

For all the foregoing reasons, the Court should deny final approval of the settlement because it is not fair, reasonable, or adequate.

## II.   BACKGROUND

**A.   Factual Background**

At the center of both the California Action and the Nevada Action is RINO, which is a public holding company incorporated in Nevada and headquartered in the People's

Objections of Norman Miller to the Proposed Settlement

Republic of China.  ¶ 2.[3]  RINO operates as an environmental protection and remediation company.  ¶¶ 2, 33.  During the relevant period, Zou Dejun served as RINO's Chief Executive Officer and his wife, Qiu Jianping, served as the Chairwoman of RINO's board of directors.  ¶ 12.  Zou and Qiu were founders and majority owners of RINO.  *Id.*  MSWFT and Frazer Frost are accounting firms and served as RINO's accountants during the relevant period.  ¶ 27.  Frazer Frost is the successor entity of MSWFT.  *Id.*  MSWFT audited RINO's 2008 year-end financial results, whereas Frazer Frost audited RINO's 2009 year-end financial results.  *Id.*

In 2008 and 2009, the Auditor Defendants entered into engagement agreements to provide audit and review services to RINO.  ¶¶ 35, 39.  The Auditor Defendants undertook to audit RINO's balance sheets, to review RINO's annual Forms 10-K, and to review RINO's unaudited quarterly financial information for each of the corresponding quarters, together with Forms 10-Q.  ¶¶ 35–36, 39, 41.  As part of the 2009 agreement, the Auditor Defendants also undertook to audit the Company's internal controls over financial reporting.  ¶ 40.  Pursuant to their contracts with RINO, the Auditor Defendants were required to express an opinion on the Company's financial statements in accordance with the Generally Accepted Accounting Principles ("GAAP") and to conduct their review in accordance with the standards established by the Public Company Accounting Oversight Board ("PCAOB").  ¶¶ 37, 42.  In exchange, the Auditor Defendants were compensated in the amount equal to or exceeding $505,000.00.  ¶¶ 38, 44, 48.

As subsequently disclosed, the Auditor Defendants failed to perform their obligations as required by GAAP and PCAOB.  ¶¶ 86–88.  Instead, the Auditor Defendants' professional negligence and accounting malpractice damaged RINO by allowing the insiders

---

[3] All "¶ __" references are to the Third Amended Complaint ("TAC") in the Nevada Action, filed July 15, 2015, which is the operative complaint in that action.  Declaration of Francis A. Bottini, Jr. ("Bottini Decl."), Ex. 3.  Unless otherwise noted, all internal citations and quotation marks have been omitted, and all emphasis has been added.

Objections of Norman Miller to the Proposed Settlement

to loot the Company.  ¶ 89.

On November 10, 2010, Muddy Waters, a Hong Kong investment firm that analyzes Chinese corporations, published a report alleging that RINO insiders had been improperly inflating revenue, fabricating customer relationships, lying about RINO's tax obligations, and allowing themselves to use RINO's funds illegally for personal use.  ¶ 56; *see also* ¶¶ 58–63, 69–71.  Notably, the Muddy Waters' report was based on *publicly-available* information, which was *equally available* to the Auditor Defendants and should have been discovered by them.  ¶ 56; *see also* ¶¶ 58–59, 67–71, 81.

On November 17, 2010, NASDAQ suspended trading of RINO stock and requested additional information from RINO's management regarding allegations raised in the Muddy Waters' report.  ¶ 76.  RINO's management, however, failed to provide the requested information.  *Id.*  As a result, trading in RINO's stock was halted on November 17, 2010.  ¶ 77.  The Company's stock was delisted from the NASDAQ on December 8, 2010.  ¶ 90.

The Company was severely harmed by the RINO management's self-dealing and disloyal actions and the Auditor Defendants' professional negligence.  ¶¶ 83, 89–96.  For one, the Company was harmed when Zou and Qiu funneled $40 million to their privately-held VIE as well as when they "borrowed" $3.5 million for their personal use.  ¶¶ 69–71.  The Company was also harmed because the RINO management's conduct caused RINO's stock to plummet from $20.74 in April 2010 to around five cents currently, resulting in a loss of nearly $500 million in market capitalization.  ¶ 90.  The Company also had to expend significant sums of money to defend itself from the resulting lawsuits as well as government investigations.  ¶ 91.

**B.    The California Action's Procedural History**

On November 12, 2010 and thereafter, several securities-fraud class actions were filed in this Court against RINO and several of its officers and directors ("RINO Defendants") alleging violations of § 10(b) of the Securities Exchange Act of 1934 and Rule

Objections of Norman Miller to the Proposed Settlement

10b-5 promulgated thereunder.  On February 16, 2011, these actions were consolidated. On April 18, 2011, a consolidated amended complaint was filed in the California Action.

On July 6, 2012, the California Plaintiffs filed a second amended complaint, adding Frazer Frost as a defendant and alleging violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Frazer Frost.  Dkt. No. 197.  The Fourth Amended Complaint, which is the operative complaint in the California Action, was filed on January 31, 2014.  Dk. No. 272.  Frazer Frost is the only remaining defendant.

## C.    Previous Settlement with the RINO Defendants

Beginning in late 2011 and through early 2012, the parties in the California Action, the Nevada Action, and several other actions engaged in mediation.  Pursuant to that mediation, the parties agreed to settle (1) the securities-fraud claims against RINO and its officers and directors, and (2) the derivative claims against RINO's officers and directors.

The settlement of the securities-fraud claims against the RINO Defendants was presented to this Court, and the Court granted final approval to that settlement on December 19, 2012.   Among other things, the stipulation of settlement expressly excluded "all claims brought in any of the Derivative Actions to the extent of the claims stated in the Derivative Actions."  Dkt. No. 192 at 8 (¶ 1.31).  The Nevada Action was one of the derivative actions included in the definition of "Derivative Actions."  *Id.* at 6 (¶ 1.12) ("'Derivative Actions' means, collectively, the following:  (a) *In re RINO International Corp. Derivative Action*, Case No. 10-OC-005291 B, Dept. No. I, in the First Judicial District Court of the State of Nevada in and for Carson City ('Nevada State Derivative Action') … .").

The settlement of the derivative claims against the RINO officers and directors was presented to the U.S. District Court for the District of Nevada.  On July 23, 2013, that court granted final approval to the settlement.  The stipulation of settlement expressly excluded the following claims from the scope of the released claims:  (1) the claims asserted in the California Action; and (2) the claims asserted in the Nevada Action against MSWFT and

5

Frazer Frost.  *See* Bottini Decl., Ex. 2 at 10–11 (¶ 1.33) ("'Plaintiffs' Released Claims' expressly excludes, however, all claims asserted in the related securities class action captioned *Stream SICAV v. RINO International Corp. et al.*, Case No. 2:10-cv08695-DDP-VBK, pending in the U.S. District Court for the Central District of California, to the extent of the claims stated in that action.  Plaintiffs' Release Claims also specifically does not include the claims asserted by the Nevada State Plaintiffs against Moore Stephens Wurth Frazer & Torbet LLP and Frazer Frost LLP.'").

Furthermore, the stipulation of settlement in the derivative actions expressly provided that the Nevada Plaintiffs shall have the exclusive right to pursue any and all claims against MSWFT and Frazer Frost and required RINO to assign its rights (and any recovery) against MSWFT and Frazer Frost to the Nevada Plaintiffs upon their request:

> The Nevada State Plaintiffs [and their counsel] shall have the exclusive and sole ability to pursue any and all claims against the Auditor Defendants.  Upon election and notice by the Nevada State Plaintiffs [and their counsel] to the Defendants, Nominal Defendant RINO shall assign any and all rights it has against the Auditor Defendants to the Nevada State Plaintiffs.  Such assignment shall include the assignment by RINO of any and all recovery obtained by the Nevada State Plaintiffs against the Auditor Defendants to the Current RINO Shareholders.

*Id.*, Ex. 2 at 13 (¶ 2.3).

As discussed below, the proposed settlement at issue in this case, while excluding the Nevada Plaintiffs' derivative claims from the proposed release, does not exclude (and, in fact, purports to release) the Nevada Plaintiffs' direct, state-law claim.

**D.    The Nevada Action's Procedural History**

The Nevada Plaintiffs are current shareholders of RINO.  ¶ 26.  On December 3, 2010, the Nevada Plaintiffs commenced the Nevada Action as a shareholder derivative

Objections of Norman Miller to the Proposed Settlement

action on behalf of RINO and against certain officers and directors of RINO.  On August 3, 2011 — nearly a year before Frazer Frost was added as a defendant in the California Action — the Nevada Plaintiffs filed their first amended consolidated complaint, adding MSWFT and Frazer Frost as defendants.

Following the settlement with the RINO defendants, the Nevada Plaintiffs dismissed those defendants from the Nevada Action.  Pursuant to the settlement, following the dismissal of the other defendants, RINO assigned to the Nevada Plaintiffs all rights and claims (and recovery) it possesses against MSWFT and Frazer Frost.  ¶ 26.

On October 21, 2013, the Nevada Plaintiffs filed the second amended complaint as a direct action against MSWFT and Frazer Frost to enforce the rights and claims assigned by RINO.  The second amended complaint alleged two claims, both of which were brought by the Nevada Plaintiffs as assignees of RINO:  (1) professional negligence and accounting malpractice; and (2) breach of contract.  MSWFT and Frazer Frost moved to dismiss.  On April 17, 2014, the state court denied the motion to dismiss.

On May 26, 2015, the Nevada Plaintiffs sought leave to file a third amended complaint to add a direct class claim against MSWFT and Frazer Frost for aiding and abetting the RINO insiders' breaches of fiduciary duties.  On July 6, 2015, the state court granted the Nevada Plaintiffs' motion.  The TAC was filed on July 15, 2015.

The TAC retained the first and second causes of action, which the Nevada Plaintiffs bring as assignees of RINO's rights and claims and through which the Nevada Plaintiffs seek to recover against MSWFT and Frazer Frost for the harm that was originally suffered by RINO. ¶¶ 110–137.

The TAC also added a third cause of action under Nevada state law for aiding and abetting breaches of fiduciary duties against MSWFT and Frazer Frost.  ¶¶ 138–149.  This cause of action is brought as a class action on behalf of the Nevada Plaintiffs and all other persons who held RINO stock after the delisting of RINO's stock on December 8, 2010 (the "Nevada Action Class").  ¶ 97.  The TAC alleges that as a result of the Auditor

Objections of Norman Miller to the Proposed Settlement

Defendants' aiding and abetting of the RINO insiders' wrongdoing, the Nevada Plaintiffs

and the Nevada Action Class were injured when RINO's stock was delisted.  ¶ 103.  The

delisting caused direct harm to the Nevada Plaintiffs and the Nevada Action Class because

it eliminated the market for RINO's shares, leaving them with a worthless security.  *Id.*

Latching onto this direct class claim, MSWFT and Frazer Frost removed the Nevada

Action to federal court, arguing that the class claim was precluded under the Securities

Litigation Uniform Standards Act of 1998, Pub. L. No. 105-353, 112 Stat. 3227 ("SLUSA").

On August 6, 2015, MSWFT and Frazer Frost filed a motion to dismiss the third cause of

action as precluded under SLUSA.  Bottini Decl. ¶ 23.  On August 24, 2015, Nevada

Plaintiffs filed a motion to remand the Nevada Action.  *Id.* ¶ 24.  Both motions are fully

briefed as of September 21, 2015.  On December 9, 2015, the District of Nevada set a

hearing on both motions for January 19, 2016.  *Id.* ¶ 26.

**E.     The California Plaintiffs' Settlement with Frazer Frost and Initial Refusal to Exclude Any of the Nevada Plaintiffs' Claims**

On August 27, 2015, the California Plaintiffs filed a motion for preliminary approval

of settlement with Frazer Frost, the only remaining defendant in the California Action

("Preliminary Approval Motion").  Dkt. No. 278.  At the same time, the California Plaintiffs

submitted a Stipulation of Settlement for the Court's review.  Dkt. No. 277.

Among other things, the initial stipulation included an extraordinarily broad release

clause, which defines the "Released Claims" as:

> collectively, ***all claims*** (including 'Unknown Claims [as separately defined]) ***of***
> ***every nature and description whatsoever***, known or unknown, asserted ***or***
> ***that might have been asserted*** or that might be asserted, against Defendant,
> … ***arising out of, based upon or related to*** (a) the purchase, acquisition, or
> sale of RINO common stock, call options or put options during the Class
> Period, or (b) ***the subject matter of the Action, or the facts, transactions,***

Objections of Norman Miller to the Proposed Settlement

*events, occurrences, acts, disclosures, statements, omissions or failures to act which were <u>or could have been alleged</u> in the Action*.

Dkt. No. 277 at 9 (¶ 1.30).  Notably, unlike the stipulation of settlement with the RINO Defendants, the initial stipulation did not exclude any of the state-law claims asserted by the Nevada Plaintiffs in the Nevada Action.

On August 28, 2015, concerned that the language of the initial stipulation was significantly broad to encompass the Nevada Plaintiffs' state-law claims, counsel for the Nevada Plaintiffs sought to meet and confer with counsel for the California Plaintiffs and Frazer Frost ("Settling Parties").  The Nevada Plaintiffs requested that the Settling Parties voluntarily revise the scope of the release to exclude any and all claims asserted in the Nevada Action.  The Settling Parties refused, forcing the Nevada Plaintiffs to file a motion to intervene as well as an opposition to the motion for preliminary approval.

**F.    The Revised Settlement**

The Court held a hearing on the initial preliminary approval motion on September 28, 2015.  Following the hearing, the Settling Parties submitted an Amended Stipulation of Settlement ("Stipulation").  Dkt. No. 288.  Rather than cure the deficiencies in the initial stipulation identified at the September 28, 2015 hearing, the Settling Parties actually made the proposed settlement more unfair and objectionable by (1) *increasing* the scope of the release; (2) amending the stipulation to release claims of RINO shareholders who merely held RINO stock during the Class Period, even though federal securities laws do not provide remedies for "holder" claims; and (3) attempting to release the Nevada Plaintiffs' direct, state-law claim for aiding and abetting breaches of fiduciary duties.

The Nevada Plaintiffs opposed preliminary approval of the amended stipulation.  On October 26, 2015, the Court held a hearing on the Nevada Plaintiffs' motion to intervene and granted their motion.  Dkt. No. 293.  On October 27, 2015, without any further hearing, the Court granted preliminary approval to the amended stipulation.  Dkt. No. 294.

Objections of Norman Miller to the Proposed Settlement

### III.   LEGAL STANDARD

Rule 23 of the Federal Rules of Civil Procedure mandates judicial review of any settlement of the "claims, issues, or defenses of a certified class." Fed. R. Civ. P. 23(e).  At the final fairness hearing, the proponents of the settlement must demonstrate that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  Regardless of the amount of opposition to the settlement agreement, the Court "must make an independent analysis of the settlement terms and examine whether the interests of the class are better served by the proposed settlement than by further litigation." *Sobel v. Hertz Corp.*, No. 3:06-cv-0545-LRH-RAM, 2011 WL 2559565, a *5 (D. Nev. June 27, 2011)  Moreover, where, as here, "the parties reach a settlement agreement *prior to* class certification, courts must peruse the proposed compromise to ratify both *the propriety* of the certification and *the fairness* of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

Settlement approval prior to class certification "requires a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) o.  The Court "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).  Notably, "a district court may not simply rubber stamp stipulated settlements," but "must be careful to make sure absent class members will be treated fairly." *Kakani v. Oracle Corp.*, No. C 06-06493 WHA, 2007 WL 1793774, at *1 (N.D. Cal. June 19, 2007).[4]

---

[4] *See also Stokes v. Interline Brands, Inc.*, No. 12-cv-05527-JD, 2014 WL 5826335, at *1 (N.D. Cal. Nov. 10, 2014) ("But the role of the Court is not to rubber-stamp proposed class settlements simply because counsel for the parties say it is a good result.  The Court is required to review the proposed settlement to ensure that absent class members are being treated fairly and reasonably, and are not victims of a deal between attorneys for the parties to cut and run.  That review is particularly critical when, as here, a proposed settlement has been reached before a class has been certified.").

10

To determine whether the settlement is fair, adequate, and reasonable, the Court considers several factors, including (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Staton*, 327 F.3d at 959.  These factors are not exclusive, and some may warrant more weight than others depending on the circumstances. *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

The California Plaintiffs argue that a presumption of fairness should apply here because "the settlement agreement was reached in arm's length negotiations after relevant discovery had taken place." Dkt. No. 297-1 at 4.  But the appropriateness of a presumption of fairness is "undermine[d]" by "the fact that this settlement was negotiated prior to the court certifying the class." *Sobel*, 2011 WL 2559565, a *6.  Indeed, settlement approval prior to class certification "requires *a higher standard of fairness* and *a more probing inquiry* than may normally be required under Rule 23(e)." *Dennis*, 697 F.3d at 864; *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (same).

Moreover, before approval is granted, the Court must *also* ensure "the propriety of the certification." *Staton*, 327 F.3d at 952.  The Court "must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012); *see also Staton*, 327 F.3d at 952 (the district court must "assess whether a class exists").  When "[c]onfronted with a request for settlement-only class certification," the Court must pay "undiluted, even heightened, attention" to class-certification requirements. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  Indeed, such attention is of "vital importance," because "a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.*

11

Objections of Norman Miller to the Proposed Settlement

## IV.   ARGUMENT

As noted above, where the settlement has been reached prior to class certification, "a higher standard of fairness" applies. *Dennis*, 697 F.3d at 864; *Hanlon*, 150 F.3d at 1026. Here, three factors weigh heavily against granting the final approval to the proposed settlement:  (1) overbroad release; (2) California Plaintiffs' inadequacy in representing the Nevada Plaintiffs and the Nevada Action Class; and (3) inadequate amount recovered.

**A.    The Proposed Settlement Is Not Fair or Reasonable Because It Includes an Overbroad Release that Purports to Release Claims that Could Not Have Been Asserted in This Action, Including the Nevada Plaintiffs' Direct, State-Law Claims that Are Currently Pending in the Nevada Action**

The release clause in the present case is impermissibly broad, purporting to release "all claims … of every nature and description whatsoever, known or unknown, asserted or that might have been asserted … arising out of, based upon or related to (a) the purchase, acquisition, sale *or ownership of RINO common stock*, call options or put options during the Class Period, or (b) the subject matter of the [a]ction, or the facts, transactions, events, occurrences, acts, disclosures, statements, omissions or failures to act which were or could have been alleged in the [a]ction." Dkt. No. 288 at 9 (¶ 1.30).

**1.    The Proposed Release Goes Far Beyond the Claims Asserted in This Action by Attempting to Release "Holder" Claims that Are Not — and Could Not Have Been — Asserted in This Action**

The proposed release goes far beyond the federal securities-fraud claims asserted in the complaint.  As stated in the operative complaint, "[t]his is a *federal securities class action* against Frazer Frost, LLP … on behalf of a class consisting of all persons and entities … who purchased the publicly traded common stock and call options and who sold put options of RINO [during the applicable period], seeking to recover damages caused by Frazer's violations of *federal securities laws*." Dkt. No. 272 at 9 (¶ 3).  The complaint alleges violations of § 10(b) of the Exchange Act and Rule 10b-5, which "prohibit making any material misstatement or omission in connection with the *purchase* or *sale* of any security."

Objections of Norman Miller to the Proposed Settlement

1   *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014).

2       The proposed release, however, is significantly broader than the claims asserted

3   because it *also* attempts to release any and all claims "arising out of, based upon or related to

4   … ***ownership of RINO common stock*** … during the Class Period." Dkt. No. 288 at 9

5   (¶ 1.30). But the federal securities law does *not* provide remedies for mere "holders" of

6   securities. *See Blue Chip Stamps*, 421 U.S. at 738–40, 749; *see also Merrill Lynch, Pierce, Fenner &*

7   *Smith Inc. v. Dabit*, 547 U.S. 71, 79–80 (2006) (observing that due to "policy considerations,"

8   the Supreme Court in *Blue Chip Stamps* chose to limit the private remedy available under

9   Rule 10b-5 "to plaintiffs who were themselves purchases or sellers"). In other words, under

10   *Blue Chip Stamps*, a company's fraudulent misrepresentation regarding its financial condition

11   must induce the plaintiff to either *purchase* or *sell* that company's securities in order for the

12   plaintiff to have standing to sue under federal securities law. An individual lacks standing is

13   he or she merely foregoes purchasing or selling and/or decides to continue holding the

14   shares in connection with the company's fraudulent misrepresentation.

15       Because the California Plaintiffs do not assert — and could not have asserted — the

16   "holder" claims in this litigation, they have no standing to bring those claims *or to release them*

17   through the overly broad release in the Stipulation, particularly where these claims are

18   pending in a different lawsuit and no separate consideration is being provided for the

19   release of these claims. *See Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 783 (7th Cir. 2004)

20   (reversing final approval of a class-action settlement where the settlement released without

21   consideration the claims of a subclass that were the subject of another action); *Ferrington v.*

22   *McAfee, Inc.*, No. 10-CV-1455-LHK, 2012 WL 1156399, at **8–10 (N.D. Cal. Apr. 6, 2012)

23   (denying final approval of a class-action settlement where the settlement released without

24   consideration the claims of a subclass that were the subject of another action).

25   / / /

26   / / /

27   / / /

28

Objections of Norman Miller to the Proposed Settlement

**2.    The Proposed Release Improperly Attempts to Release the Nevada Plaintiffs' Direct, State-Law Claim for Aiding and Abetting Breaches of Fiduciary Duties that Is Currently Pending in the Nevada Action**

The proposed release is even broader than the subject matter of this action, purporting to release *not* just the federal securities law claims, but also *state-law claims* that have nothing to do with "any material misstatement or omission in connection with the purchase or sale of any security." Dkt. No. 288 at 9 (¶ 1.30). In particular, this would include the Nevada Plaintiffs' meritorious direct, state-law claim for aiding and abetting breaches of fiduciary duties that is currently pending in the Nevada Action. In fact, following the September 28, 2015 hearing (where they were advised that the initial stipulation was deficient because it purported to release *all* of the Nevada Plaintiffs' state-law claims), the Settling Parties amended the stipulation by expressly excluding the Nevada Plaintiffs' derivative, state-law claims from the scope of the released claims. *See* Dkt. No. 288 at 9–10 (¶ 1.30) ("Released Claims specifically excludes the derivative/assigned claims which purport to pursue RINO's rights and claims against Defendant (as defined in the First Cause of Action for 'Professional Negligence and Accounting Malpractice' and the Second Cause of Action for 'Breach of Contract') asserted in the [Nevada Action]"). The same amendment, however, also broadened the scope of the release by *including* the Nevada Plaintiffs' direct, state-law claim within the scope of the released claims. *See id.* ("Released Claims specifically includes the direct claims (as defined in the Third Cause of Action for 'Aiding and Abetting Breached of Fiduciary Duty') in the Nevada Action complaint on behalf of purchasers of RINO stock during the Class Period … ."). The Settling Parties' inclusion of the Nevada Plaintiffs' direct, state-law claim for aiding and abetting within the Stipulation's broad release is improper.

The direct claim asserted in the Nevada Action is brought under Nevada state law and alleges that MSWFT and Frazer Frost aided and abetted the breaches of fiduciary duties by the RINO insiders. *See* ¶¶ 138–149. This cause of action does *not* purport to recover for

Objections of Norman Miller to the Proposed Settlement

1   violations of any federal securities laws, nor does it allege or involve any material

2   misstatement or omission in connection with the purchase or sale of any security, or even

3   the "holding" of RINO stock based on any false or misleading statements or omissions by

4   the Auditor Defendants.  Rather, it is a garden-variety state-law claim against the Company's

5   auditors for aiding and abetting the officers' and directors' breaches of fiduciary duties.

6          The gravamen of the Nevada Plaintiffs' direct claim is that MSWFT and Frazer Frost

7   negligently performed their audits of RINO's financial statements, which allowed the

8   insiders to loot the company, ultimately leading to the delisting of RINO's stock.  ¶¶ 103–

9   109.  Although the direct claim is brought on behalf of all persons who held RINO stock

10  on December 8, 2010, when the stock was delisted from the NASDAQ, the harm asserted

11  is *not* any devaluation of the RINO stock.  Rather, the harm is the actual act of *delisting* of

12  RINO's shares, which "caused direct and immediate harm to shareholders who held the

13  stock as of the date of the delisting because such shareholders are not able to sell their stock

14  and thus are left with a worthless security."  ¶ 103.

15         Although a claim for aiding and abetting breaches of fiduciary duties is typically a

16  derivative claim, there are unique facts in this case that give rise to a direct claim.  Namely,

17  when the NASDAQ delisted RINO's stock as of December 8, 2010, followed by the halting

18  of trading in RINO's shares on the OTC bulletin board by the U.S. Securities and Exchange

19  Commission on April 11, 2011, those RINO shareholders who still owned RINO stock as

20  of such date were directly harmed by being deprived of a market for the sale of their stock.

21  *See* ¶¶ 103–109.  Courts have recognized that the delisting of a company's stock is a unique

22  event that gives rise to direct claims by shareholders who are directly harmed by the

23  delisting.  *See, e.g., Hamilton v. Nozko*, Civ. A. No. 13014, 1994 WL 413299, at **6–7 (Del.

24  Ch. July 27, 1994) (upholding a direct claim based on delisting).

25         But even though the Nevada Plaintiffs' direct claim has nothing to do with the

26  federal securities laws, it is nonetheless being released in the proposed settlement in this

27  action.  Notably, there has been no showing that the class members have been

28

Objections of Norman Miller to the Proposed Settlement

independently compensated for the release of their valuable state-law claims against Frazer Frost for aiding and abetting the RINO insiders' breaches of fiduciary duties.  Courts have frequently rejected attempts to release unrelated claims where there has been no showing that any compensation was provided for such a release.  *See, e.g.*, *Mirfasihi*, 356 F.3d at 783; *Ferrington*, 2012 WL 1156399, at **8–10.

The Settling Parties' purported release of the Nevada Plaintiffs' direct, state-law claim through the proposed settlement represents an impermissible attempt to achieve a "back door" dismissal of that claim in the Nevada Action.  But, as discussed above, this precise issue is currently pending before Judge Jones in the District of Nevada, who will hear argument on the issue on January 19, 2016.  At issue in that hearing will be whether the Nevada Plaintiffs' direct, state-law claim alleges a material misstatement or omission in connection with the purchase or sale of a security.  If it does *not*, then, *a fortiori*, the Nevada Plaintiffs' direct, state-law claim would *fall outside* the scope of this lawsuit and, thus, its release would be improper.

Finally, all this could have been easily avoided if the Settling Parties would have included the same "exclusion" language as was included in the prior settlement with the RINO defendants, which expressly excluded *all* claims asserted in the Nevada Action.  *See* Dkt. No. 192 at 8 (¶ 1.31) (the stipulation of settlement expressly excluded "all claims brought in any of the Derivative Actions to the extent of the claims stated in the Derivative Actions").  Accordingly, the Court should deny final approval of the settlement and should instead, consistent with the prior settlement, require the Settling Parties to expressly exclude from the Stipulation's broad release "*all claims* brought in [the Nevada Action] to the extent of the claims stated in the [Nevada Action]."  *See id.*

/ / /

/ / /

/ / /

/ / /

Objections of Norman Miller to the Proposed Settlement

**B.**     **Conditional Class Certification for Settlement Purposes Is Not Appropriate Because the California Plaintiffs Cannot Adequately Represent the Nevada Plaintiffs and the Nevada Action Class as to Their Direct, State-Law Claim for Aiding and Abetting Breaches of Fiduciary Duties**

As noted above, when conditionally certifying a class for settlement purposes, the Court must pay "undiluted, even heightened, attention" to class-certification requirements. *Amchem*, 521 U.S. at 620. Such attention is of "vital importance," because "a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.* Here, the same considerations as outlined *supra* in Part IV.A also weigh against granting conditional class certification.

Before the proposed settlement in the California Action can release the Nevada Plaintiffs' direct, state-law claim for aiding and abetting breaches of fiduciary duty asserted in the Nevada Action, there must be adequate representation of the "Nevada Action" subclass. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 588 (9th Cir. 2010). "Class representation is inadequate if the named plaintiff fails to prosecute the action vigorously on behalf of the entire class or has an insurmountable conflict of interest with other class members." *Id.* at 589. "Conflicts of interest may arise when one group within a larger class possesses a claim that is neither typical of the rest of the class nor shared by the class representative." *Id.*

For example, in *Hesse*, the plaintiffs brought class actions in Washington state court alleging that Sprint violated Washington's business & occupation tax statute by unlawfully passing the tax imposed by the statute directly to the consumers. *Id.* at 584–85. Following removal, the district court granted Sprint's motion for summary judgment, finding plaintiffs' claims to be barred by a class settlement between Sprint and its customers approved by a Kansas state court in 2006. *Id.* at 585. The Kansas settlement involved Sprint's surcharges to recoup *federal* regulatory fees. *Id.*

The Ninth Circuit reversed. The court observed that it was "not disputed that the named plaintiffs in the case before [the court] were members of the [Kansas] class and that they did not opt out." *Id.* Moreover, the Kansas settlement included a broad release of

17

liability for all "claims … that … could have been … asserted … in another court or proceeding which related … to allegations that … Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes." *Id.* at 587. Nonetheless, the Ninth Circuit concluded that the release could not preclude the Washington plaintiffs' claims because (1) the Kansas class plaintiff "did not adequately represent" the Washington plaintiffs and (2) the Washington plaintiffs' claims "[were] based on a set of facts different from those underlying the claims settled" in Kansas. *Id.* Specifically, the court held that "the [Kansas] [p]laintiff's interest in settling his federal [r]egulatory [f]ee claims, even at the cost of a broad release of other claims he did not possess, was in conflict with the Washington [p]laintiffs' unrepresented interest in prosecuting their [Washington state-law] claims." *Id.* at 589.  In sum, the Kansas plaintiff's representation of the Washington plaintiffs was "inadequate" as to the Washington state-law claims. *Id.*

The same is true here.  To the extent the Nevada Plaintiffs and the Nevada Action Class purchased RINO shares during the Class Period, they are class members in this action.  But the Nevada Plaintiffs and the Nevada Action Class also have *separate* claims available to them under Nevada law for MSWFT and Frazer Frost's aiding and abetting of RINO insiders' breaches of fiduciary duties that have nothing to do with violations of federal securities laws and do not attempt to recover for any devaluation of RINO stock. Because the plaintiffs in this case have no standing to assert "holder" claims in federal court, they cannot and do not have standing to adequately represent the Nevada Plaintiffs' state-law claims.  To paraphrase *Hesse*, "the [California Plaintiffs'] interest in settling [their] federal [securities law] claims [is] in conflict with the [Nevada Plaintiffs'] unrepresented interest in prosecuting their [Nevada state-law] claims." *See id.* at 589.  Thus, just like in *Hesse*, the California Plaintiffs' representation of the Nevada Plaintiffs is "inadequate" *as to the Nevada state-law class claim for aiding and abetting.  See id.*

/ / /

Objections of Norman Miller to the Proposed Settlement

**C.     The Amount of the Proposed Settlement Is Woefully Inadequate**

The proposed settlement provides for a recovery of $1,685,000 before the deduction of attorneys' fees and expenses and incentive awards.  On the other hand, the California Plaintiffs acknowledge that the damages in the entire case were $157,900,000.  *See* Dkt. No. 297-1 at 10.  After deducting the previous $7 million settlement with the RINO defendants, the damages are currently $150,900,000.  The California Plaintiffs further estimate that under the PSLRA, Frazer Frost's proportionate liability for the total amount of damages "is likely in the range of 10% to 40%."  *Id.*  Accordingly, based on the assumptions provided by the California Plaintiffs themselves, the total amount provided for by the proposed settlement constitutes a mere ***2.79%*** of the maximum damages (measured by 40% of total damages).[5]  Once the attorneys' fees, expenses, and incentive awards are deducted, the total amount recovered drops to a paltry ***1.65%*** of the maximum recoverable damages.[6]

The proposed amount (whether 2.67% or the actual 1.58%) is clearly inadequate when compared to average damages recovered across securities class actions.  *See* Denise N. Martin *et al.*, National Economic Research Associates, Inc., *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions*, 5 STAN. J. L. BUS. & FIN. 121, 123 (1999) ("The average proportion of settlement amount to plaintiffs' claimed damages is ***14 percent***.  The average proportion of settlement amount to investor losses is about ***9 percent***."); *id.* at 140 (analyzing 46 shareholder class actions using "the plaintiffs' claimed damages," *i.e.*, where "actual estimates of damages [were] made by plaintiffs' experts," and observing that the "average settlement was ***13.7 percent*** of plaintiffs' claimed damages,

---

[5] $157,900,000 minus $7,000,000 previously recovered equals $150,900,000.  40% of $150,900,000 is $60,360,000.  $1,685,000 divided by $60,360,000 equals 0.0279 or 2.79%.

[6] The California Plaintiffs seek an award of $421,250 in attorneys' fees, $257,457.67 in expenses, and $10,000 in incentive awards.  *See* Dkt. No. 298-1 at 1, 18–19.  Subtracting this amount from $1,685,000 yields $996,292.33.  $996,292.33 divided by $60,360,000 equals 0.0165 or 1.65%.

Objections of Norman Miller to the Proposed Settlement

while the median was **11.9 percent** of damages"); *see also In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 324 (E.D.N.Y. 1993) (approving settlement that recovered 10% of the total damages, or 6% after attorneys' fees and expenses are subtracted).[7]

Arguing the contrary, the California Plaintiffs conclusory assert that "pragmatic considerations" support the woefully-low settlement amount because "it is uncertain whether Defendant has the assets necessary to withstand a judgment in excess of the proceeds remaining from its insurance policy." Dkt. No. 297-1 at 9. According to the California Plaintiffs, "Defendant's $10 million in available insurance has been significantly depleted by defense costs in connection with this [a]ction." *Id.* But what the California Plaintiffs fail to mention, however, is that Frazer Frost has a total of $15 million worth of insurance policies providing coverage for the plaintiffs' claims, including $10 million in primary coverage and a $5 million excess policy. Bottini Decl. ¶ 39. Nor do the California Plaintiffs provide any documentation as to how much coverage remained on the primary policy at the time the settlement with Frazer Frost was reached. Moreover, Frazer Frost (the only remaining defendant) continues to be a thriving accounting firm. Thus, this is *not* a case where the defendant is in bankruptcy and/or the insurance proceeds are so depleted as to make it uncertain whether the defendant can withstand a judgment.[8]

---

[7] This is confirmed by the sources cited by the California Plaintiffs. *See, e.g.*, Ellen M. Ryan & Laura E. Simmons, Cornerstone Research, *Securities Class Action Settlements: 2010 Review and Analysis* at 5, *available at* http://securities.stanford.edu/research-reports/1996-2010/Settlements-Through-12-2010.pdf (between 1996 and 2009, securities class actions where plaintiff-style damages did not exceed $249 million settled in the range between **3.6% and 10.7%**, with the percentage increasing as the total damages decreased).

[8] In this regard, the California Plaintiffs' citation to *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993), is clearly inapposite. In *Torrisi*, the Ninth Circuit observed that the defendant's financial condition" "predominate[d]" over the other factors where, "[a]t the time of the settlement[, the company] was involved in negotiations with its creditors to restructure its debt and had had an involuntary bankruptcy petition recently filed against it," "[i]t had declared a payment moratorium on its debts, and was attempting to obtain regulatory permission to raise its rates to permit it to continue operating." *Id.* at 1376.

Objections of Norman Miller to the Proposed Settlement

## V.   CONCLUSION

For the foregoing reasons, because the proposed settlement is not fair, reasonable, or adequate, and because the requirements for conditional class certification are not met, the Court should deny the motion for final approval of class action settlement.

Dated:  December 21, 2015                 Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang
Yury A. Kolesnikov


                                          s/ Francis A. Bottini, Jr.
                                         Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002

*Counsel for Norman Miller*

Objections of Norman Miller to the Proposed Settlement

# CERTIFICATE OF SERVICE

I certify that, on December 21, 2015, I caused the foregoing document to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send notification of such filing to the attorneys of record at their listed email addresses. Additionally, copies were served via overnight mail to the addresses below:

Laurence M. Rosen
The Rosen Law Firm, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071

Heather Rosing
Klinedinst, P.C.
501 West Broadway, Suite 600
San Diego, California 92101

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

Certificate of Service